861 F.2d 1102
 WALNUT PROPERTIES, INC., a California corporation; and
Vincent Miranda, Plaintiffs-Appellees,
v.
CITY OF WHITTIER; M.D. Klaxton; R.L. Henderson; L.A.
Strong; James Bale, as Chief of Police, City of Whittier;
J. Robert Flandrick, as City Attorney, City of Whittier;
and Whittier City Council, Defendants-Appellants.
WALNUT PROPERTIES, INC., a California corporation, Plaintiff-Appellee,
v.
J. Robert FLANDRICK; James Bale; City of Whittier;
Whittier City Council; and Elvin Porter,
Defendants-Appellants.
WALNUT PROPERTIES, INC., a California corporation; and
Vincent Miranda, Plaintiffs-Appellees,
v.
CITY OF WHITTIER; M.D. Klaxton, R.L. Henderson, L.A.
Strong, Gene Chandler, and V.A. Lopez, as Members of the
Whittier City Council; James Bale, as Chief of Police of
the City of Whittier; and J. Robert Flandrick, as City
Attorney of the City of Whittier, Defendants-Appellants.
 Nos. 86-5645, 87-5748, 87-5859 and 87-5956.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 10, 1987.
Decided Nov. 9, 1988.
 
 J. Robert Flandrick and Virginia Pesola, City Attys. and Burke, Williams & Sorensen, Los Angeles, Cal., for defendants-appellants.
 Stanley Fleishman, Fleishman, Fisher & Moest, Los Angeles, Cal., for plaintiffs-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before BROWNING, HUG and REINHARDT, Circuit Judges.
 HUG, Circuit Judge:
 
 
 1
 In this action, Walnut Properties, Inc. ("Walnut") challenges the constitutionality of a municipal zoning ordinance which regulates the location of adult businesses. The city of Whittier, California ("City") adopted an ordinance prohibiting, among other things, the location of adult businesses within 1,000 feet of a church. Walnut's adult "Pussycat" Theater violates that provision. At issue is whether enforcement of the ordinance would deprive Walnut of its First Amendment rights. This case also involves issues of abstention and immunity. We affirm the district court's finding that the ordinance is unconstitutional on the basis that it fails to provide for reasonable alternative avenues of communication.
 
 FACTS
 
 2
 In May, 1977, Walnut began operation of its theater and exhibited "adult" films. In June, 1977, the City enacted an "urgency" ordinance imposing locational restrictions on adult businesses. The ordinance allowed the City's planning department time to study the problems associated with adult businesses and to consider potential zoning remedies. A study was conducted, and it revealed that, at that time, 13 adult businesses were located within the city boundaries; these operations included massage parlors, nude model studios, adult bookstores, and an adult theater (Walnut's Pussycat Theater). According to the City, the study indicated several undesirable secondary effects associated with these adult businesses.
 
 
 3
 Following the study, the City reenacted the ordinance several times. The City brought an action against Walnut in Los Angeles Superior Court seeking to enjoin Walnut from operating its theater because it violated the restrictions. The course of proceedings at the state level has not yet ended; instead, those proceedings have been stayed pending resolution of the federal proceedings.
 
 
 4
 The present action arises from the City's adoption of Ordinance No. 2257, on March 24, 1981. Like the preceding ordinances, that ordinance allowed adult businesses in commercial and industrial zones, but imposed certain separation requirements. The ordinance prohibited adult businesses within 500 feet of residential lots and establishments holding liquor licenses, and within 1,000 feet of schools, churches, parks, or other adult businesses.
 
 
 5
 On May 7, 1981, Walnut filed an action in federal district court seeking an injunction to restrain the City from enforcing the ordinance on the basis that it was unconstitutional. The district court held invalid that part of the ordinance prohibiting the location of an adult business within 1,000 feet of a church. The court rested its holding on the basis that there were insufficient facts to prove that the prohibition furthered a compelling state interest, and that a motivating factor in enacting the ordinance was the desire to restrict Walnut's exercise of First Amendment rights.
 
 
 6
 Less than one week after the Findings of Fact and Conclusions of Law were rendered by the district court declaring the ordinance unconstitutional, City Attorney Flandrick advised the city council that it would be appropriate to consider readoption of that portion of the ordinance held unconstitutional if sufficient evidence were present to support the provision. In response, the City held public hearings on the separation requirement, and the City's planning director, Mr. Porter, began gathering evidence to remedy the deficiency found by the district court. Specifically, Mr. Porter wrote to several ministers of churches located in the City soliciting comments that would develop a factual basis for the ordinance. The responses from ministers were compiled in an April 9, 1984 staff report along with articles discussing the effects of adult businesses on children, law review articles reviewing adult business ordinances, and studies of similar ordinances in other cities. The report recommended readopting the 1,000-foot separation requirement between churches and adult businesses.
 
 
 7
 The city council did so, enacting Ordinance No. 2327 on May 22, 1984. That ordinance essentially amounted to a reenactment of the previous ordinance held unconstitutional by the district court just two months earlier, but the city council justified the reenactment on the basis that the recent study remedied the evidentiary shortfalls of the prior ordinance.
 
 
 8
 In response to this reenactment, Walnut filed another action in the district court on July 10, 1984, attacking the constitutionality of Ordinance No. 2327. Walnut sought the following: (1) a declaration that the ordinance was invalid insofar as it prohibited an adult theater from operating within 1,000 feet of a church; (2) an injunction against enforcement of the ordinance; and (3) damages against the City, City Attorney Flandrick, and Planning Director Porter, alleging that the reenactment of the ordinance violated its constitutional rights.
 
 
 9
 Walnut filed a motion for partial summary judgment declaring Ordinance No. 2327 unconstitutional. Defendants Porter and Flandrick filed a cross-motion for summary judgment or, in the alternative, partial summary judgment, asserting that Ordinance No. 2327 was constitutional and that, in any event, they were entitled to absolute immunity or, alternatively, qualified immunity. The district court denied the defendants' motion and granted partial summary judgment to Walnut declaring the ordinance unconstitutional.
 
 
 10
 Appeal was taken by the City from both of the district court decisions. For simplicity's sake, we refer to the first action--that regarding Ordinance No. 2257--as Walnut 1; we refer to the second action--involving Ordinance No. 2327--as Walnut 2.
 
 
 11
 The district court's decision in Walnut 1 was affirmed by this circuit. Walnut Properties, Inc. v. City of Whittier, Nos. 84-5755, 84-6087 (9th Cir.1985) (mem.) [762 F.2d 1020 (Table) ]. The Supreme Court, however, summarily vacated our judgment and remanded for reconsideration in light of City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29, reh'g denied, 475 U.S. 1132, 106 S.Ct. 1663, 90 L.Ed.2d 205 (1986); City of Whittier v. Walnut Properties, Inc., 475 U.S. 1042, 106 S.Ct. 1255, 89 L.Ed.2d 566 (1986) (mem.). We then vacated the district court's decision and instructed the court on remand to consider the evidence in light of Renton. Walnut Properties, Inc. v. City of Whittier, 808 F.2d 1331, 1333 (9th Cir.1986). The district court again found the ordinance unconstitutional and this appeal was taken by the City. We have jurisdiction pursuant to 28 U.S.C. Sec. 1291 (1982).
 
 
 12
 We rendered our decision in Walnut 2 following our consideration of Walnut 1 upon remand from the Supreme Court. Walnut Properties, Inc. v. City of Whittier, 807 F.2d 178 (9th Cir.1986) (order). We felt it necessary to vacate the district court's decision in Walnut 2, because, in deciding that Ordinance No. 2327 was unconstitutional, the district court had relied upon our original decision in Walnut 1, which was later vacated by the Supreme Court. We remanded Walnut 2 for reconsideration in light of Renton and this circuit's decision on remand in Walnut 1. On remand, the district court concluded that, even in light of those decisions, Walnut was entitled to partial summary judgment declaring unconstitutional the separation requirement between a church and an adult business. The court also rejected the defendants' immunity claims, and denied the City's motion for summary judgment. This appeal is from that portion of the district court's order denying Porter and Flandrick immunity. Our jurisdiction over a denial of a motion for summary judgment on an issue of immunity is established by Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985). We have consolidated Walnut 1 and Walnut 2.
 
 
 13
 On appeal, the City makes several arguments. First, it asserts that the district court erred in finding the ordinance[1] unconstitutional. Second, it argues that the district court should have abstained from exercising its jurisdiction in the first instance and on remand, given that the ordinance was the subject of an ongoing state proceeding.[2] Third, the City asserts that the district court erred in finding that Porter and Flandrick were not entitled to either absolute or qualified immunity. We affirm the district court's decision in Walnut 1. We find that the ordinance was unconstitutional as applied to Walnut, and that the district court properly exercised its jurisdiction. However, we reverse the district court's decision in Walnut 2 because we believe that Porter and Flandrick were entitled to qualified immunity for their actions. We affirm all of the attorneys' fees awards made in connection with both actions.
 
 Abstention
 
 14
 Initially, we address the threshold issue of abstention. The City contends that, in view of the state proceeding in the California court, the district court should have abstained from exercising its jurisdiction in Walnut 1 both in the first instance and on remand. See Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). This contention has no merit.
 
 
 15
 First, it is far too late to challenge the district court's decision to proceed initially with the case. The first judgment of the district court was appealed to this circuit and then to the Supreme Court. If the City wished to challenge the district court's refusal to abstain, it should have done so at the time of the original appeals. A review of our initial disposition affirming the district court, and of our opinion following remand from the Supreme Court, indicates that the abstention issue was never raised on appeal.[3] The City cannot now challenge the first decision of the district court on Younger grounds when it failed to confront us with that issue the last two times the case was before us. See, e.g., Umphlet v. Connick, 815 F.2d 1061, 1062-63 (5th Cir.1987) (state defendants voluntarily submitted to adjudication in a federal forum when they did not raise abstention arguments on appeal); Midkiff v. Tom, 702 F.2d 788, 803 (9th Cir.1983) (Poole, J. concurring).
 
 
 16
 Obviously, since we remanded the case following Supreme Court review, we felt that abstention was not appropriate. Our view has not changed. Though Younger abstention has been extended to civil proceedings in which important state interests are implicated, abstention remains the exception, rather than the rule. World Famous Drinking Emporium v. City of Tempe, 820 F.2d 1079, 1082 (9th Cir.1987) (as amended). "Absent significant countervailing interests, the federal courts are obliged to exercise their jurisdiction." Id. This circuit imposes three requirements which must be met in order for a federal court properly to invoke the Younger abstention doctrine: "(1) ongoing state judicial proceedings; (2) implication of an important state interest in the proceedings; and (3) an adequate opportunity to raise federal questions in the proceedings." Id.
 
 
 17
 We review de novo a refusal to abstain under Younger. Id. at 1081. Under the circumstances at hand, the district court quite properly proceeded with the case and issued a decision under our mandate. The City's argument fails on the basis that the first requirement for abstention was not met. The state court proceedings in this case were not "ongoing" when the district court rendered its second decision. The California Court of Appeals had remanded the state action to the trial court, and the state trial court had stayed the remand proceedings pending resolution of the federal proceedings. Thus, when the federal case was in the district court on remand there were no truly "ongoing" proceedings which would justify abstention. See Andrea Theaters v. Theater Confections, Inc., 787 F.2d 59, 63-64 (2d Cir.1986).
 
 
 18
 The City misconstrues the nature of Younger abstention. That doctrine is propelled by concerns of federalism and comity. See Ohio Bureau of Employment Services v. Hodory, 431 U.S. 471, 479, 97 S.Ct. 1898, 1903, 52 L.Ed.2d 513 (1977). Those concerns are not present where a state court has stayed its own proceedings pending resolution of the case in a federal forum. In such an instance, federal proceedings do not " 'unduly interfere with the legitimate activities of the States.' " Id. (citations omitted). If the state court voluntarily chooses to have the case decided by a federal court, "principles of comity do not demand that the federal court force the case back into the state's own system." Id. at 480, 97 S.Ct. at 1904. Moreover, a decision to abstain at this late date would result in such duplicious litigation and waste of resources that it would greatly frustrate our interests in judicial economy, with no apparent justification.
 
 Constitutionality of the Ordinance
 
 19
 When we remanded Walnut 1 to the district court after the Supreme Court vacated our earlier disposition, we instructed the district court to evaluate the ordinance in light of the principles elucidated in Renton. See Walnut Properties, 808 F.2d at 1333. The court did so, and still found the ordinance unconstitutional in three respects. First, it found that the ordinance presumptively violated the First Amendment because it was enacted for the predominant purpose of suppressing Walnut's First Amendment rights. Second, it found that the ordinance did not further a substantial governmental interest. Finally, it found that the ordinance denied Walnut a reasonable opportunity to operate its theater within the City. Because we affirm on the third basis, we need not address whether the district court was correct in holding the ordinance unconstitutional on the first two grounds.
 
 
 20
 In Renton, the Court held that an ordinance regulating the location of adult theaters violates the First Amendment if it "effectively den[ies] [theater owners] a reasonable opportunity to open and operate an adult theater within the city...." Renton, 475 U.S. at 53-54, 106 S.Ct. at 932. In finding that the City's ordinance did not allow Walnut a reasonable opportunity to operate its adult theater, the district court accepted the testimony of Walnut's expert witness that only 12 acres were available to adult businesses under the ordinance. The court also noted that the ordinance "makes it impossible to operate an adult theater in the central district of Whittier." Moreover, the court found that "since Walnut has the only theater in the City exhibiting adult films its elimination would leave the City without any theater showing such films, and the ordinance's effect would then be a total exclusion of adult theaters in the City."
 
 
 21
 We must accept the district court's factual findings unless we are left with a firm conviction that they are clearly erroneous. Johnson v. United States Postal Serv., 756 F.2d 1461, 1464 (9th Cir.1985). Of these findings, the City seriously disputes only the district court's determination of available acreage left to adult businesses. At trial, the city planning director, Mr. Porter, and Walnut's expert witness, Mr. Metcalfe, disagreed about the availability of certain sites for an adult business under the ordinance. This resulted in a discrepancy in their estimations of available acreage. Mr. Porter testified that the ordinance left 99.5 acres available for adult businesses while Mr. Metcalfe estimated that only 12 acres were available. We need not decide, however, whether the district court's acceptance of Mr. Metcalfe's figure was clearly erroneous, as the difference in acreage has no impact on the result we reach. For the purposes of argument we shall use the evidence most favorable to the City, that is, the 99.5-acre figure.
 
 
 22
 We review de novo the district court's determination that the ordinance did not allow Walnut a reasonable opportunity to operate its theater elsewhere. United States v. McConney, 728 F.2d 1195, 1201 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). Our inquiry focuses on the number of potential sites the ordinance leaves available for the location of adult businesses. We first note that, under the terms of the ordinance in question, an estimation of total available acreage is next to meaningless. This is not a case in which a greater amount of acreage would necessarily allow a greater number of sites for adult businesses. Instead, this ordinance imposes a 1,000-foot separation requirement between any two adult businesses, thereby preventing such businesses from clustering within a given area. The number of sites available to adult businesses under the ordinance, therefore, depends not so much on the total amount of acreage available under the zoning scheme, but on how that acreage is dispersed throughout the City. For example, if the zoning scheme concentrates the available acreage in just one area, most of the acreage would be consumed by the required 72-acre buffer zone surrounding each adult business.[4] In contrast, if the total available acreage is dispersed throughout the City in many small parcels--each at least 1,000 feet from the others--many more adult businesses could locate in the City because the available locations would already be adequately set apart from other sites at which adult businesses might locate. Thus, a total of 99.5 available acres is susceptible to a wide variation in the number of locations it allows for adult businesses; the number of potential sites depends, in large part, upon whether the available acreage is concentrated or dispersed.
 
 
 23
 Unfortunately, the district court made no findings with respect to the actual number of potential sites available for adult businesses under the City's ordinance, nor did testimony at trial reveal any figures. However, that deficiency does not hinder us in deciding the case because we can roughly estimate the number of available sites based on a map in the record and other information deduced at trial.
 
 
 24
 A copy of the City's official zoning map was submitted as an exhibit at trial. The map indicates the areas left for adult businesses after the restrictions of the ordinance are applied to the City's geographical area.[5] (Walnut 1; ER 74, Exh. A attached to Declaration of Porter.) The map indicates just three areas in which adult businesses may locate.[6] Thus, we have a situation in which the available acreage is concentrated. The three areas, according to Mr. Porter, comprise 99.5 acres, or 1.4% of the city's land. See Walnut 1, 808 F.2d at 1337. Though the boundaries are not so precisely drawn as to permit an estimation of the actual acreage encompassed within each area, it is quite obvious that together the areas would only allow a small handful of adult businesses to operate within the city of Whittier, in light of the required 72-acre buffer zone imposed by the ordinance.
 
 
 25
 We need not venture farther into the art of cartography to find that this ordinance does not allow sufficient alternatives for relocation of adult businesses. Even using the City's proffered evidence, the paucity of alternative sites is glaring. Moreover, we have engaged in no inquiry whatsoever as to whether these sites are presently available for sale or lease, or will likely be available in the future. To hold, as the City urges, that there are adequate alternatives available for expression of this sort would make a mockery of First Amendment protections and would render meaningless the Supreme Court's admonition that an ordinance must not "effectively den[y] ... a reasonable opportunity to open and operate an adult theater within the city." Renton, 475 U.S. at 53-54, 106 S.Ct. at 932.
 
 
 26
 The ordinance's 1,000-foot separation requirement between adult businesses makes this case vastly different from Renton, where the Supreme Court upheld an ordinance regulating the location of adult theaters. That ordinance, when applied, allowed 520 acres of " '[a]mple, accessible real estate' " for adult theater sites. Id. Within those areas, there was no separation requirement between adult businesses. Thus, all of the acreage was effectively open to adult theaters, and conceivably, the only limit to the number of theaters that could locate there stemmed from market forces. That ordinance did not impose the intrinsic limitation that this ordinance does. Though the City asserts that 99.5 acres are available in Whittier for locating an adult business, in fact, only a fraction of that acreage is potentially available. It can hardly be compared to the 520 acres in Renton, where there were no other restrictions emanating from the terms of the ordinance itself.
 
 
 27
 Two circuit courts that have analyzed ordinances imposing separation requirements between adult businesses have arrived at the same conclusion we do today. In Alexander v. City of Minneapolis, 698 F.2d 936 (8th Cir.1983), the ordinance in question required that adult businesses be separated from other adult businesses and certain other uses by 500 feet. Id. at 937. The court found the ordinance unconstitutional on the basis that it permitted, at most, 12 possible sites for relocation. Id. at 938-39. This number of sites did "not supply sufficient access to the constitutionally protected adult uses in question...." Id. at 939 n. 7. We note that the 12 sites in that case significantly outweigh the number of sites allowed under the City's ordinance in this case.
 
 
 28
 The Sixth Circuit found unconstitutional an ordinance which, when applied, apparently allowed the same range of sites as the City's ordinance. The ordinance in CLR Corp. v. Henline, 702 F.2d 637, 638 (6th Cir.1983) required adult businesses to be separated from schools, churches, and residences by 500 feet, and from other restricted uses by 1,000 feet. The court found that the ordinance impermissibly restricted First Amendment expression, as "the impact of the ... ordinance is to permit two to four restricted uses in a half-mile strip of the city." Id. at 639.
 
 
 29
 The City has argued throughout that its ordinance is constitutional because it is modeled after the one found constitutional in Young v. American Mini Theatres, Inc., 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976).[7] This argument has been made to other courts unsuccessfully. See CLR Corp., 702 F.2d at 639; Basiardanes v. City of Galveston, 682 F.2d 1203, 1213 (5th Cir.1982). As the Fifth Circuit has pointed out, "merely mimicking the ordinance upheld in [Young ] is not enough." Id. at 1213. In Young, the district court had found that there were " 'myriad locations in the City of Detroit which must be over 1000 feet from existing regulated establishments. This burden on First Amendment rights is slight.' " Young, 427 U.S. at 71-72 n. 35, 96 S.Ct. at 2452-53 n. 35. Justice Stevens, writing for a plurality of four, stated, "The situation would be quite different if the ordinance had the effect of suppressing, or greatly restricting access to, lawful speech." Id. at 71 n. 35, 96 S.Ct. at 2453 n. 35.[8]
 
 
 30
 Moreover, the plurality in Young relied on the fact that the ordinance would " 'not affect the operation of existing establishments but only the location of new ones.' " Id. at 72, n. 35, 96 S.Ct. at 2453, n. 35 (quoting the district court's findings). As we have previously noted, "there is little doubt that a majority would have questioned an ordinance putting all existing theaters out of business." Walnut Properties, 808 F.2d at 1336.[9] Yet that is precisely the effect of Whittier's ordinance. Enforcement of the ordinance as to Walnut's theater would force the only existing adult theater in Whittier to close at its present location with no definite prospect of a place to relocate. This effect makes this case markedly different from Young where the Detroit ordinance applied prospectively only and did not affect existing theaters. The Eighth Circuit in Alexander distinguished the Minneapolis ordinance at issue there from the Detroit one in Young on a similar basis, noting that enforcement of the Minneapolis ordinance would force a relocation of all five adult theaters in the city and between seven and nine of the ten adult bookstores. Alexander, 698 F.2d at 938.
 
 
 31
 We note that there is nothing in the Renton opinion which indicates that the Court would uphold an ordinance which would eliminate all adult businesses in existence at the time the ordinance was passed. The Court simply was not faced with those circumstances in that case. The ordinance at issue in Renton was directed towards adult theaters only, and at the time the ordinance was passed no adult theaters were located in Renton. See Playtime Theaters, Inc. v. City of Renton, 748 F.2d 527, 530 (9th Cir.1984), rev'd on other grounds, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). Thus it had a prospective effect only.
 
 
 32
 We therefore affirm the district court's conclusion that the City's ordinance is unconstitutional. Not only does it effectively deny Walnut a reasonable opportunity to open and operate an adult theater within the City, but it also would force the closure of all adult businesses existing at the time the ordinance was passed.
 
 Immunity
 
 33
 Having found the ordinance unconstitutional, we now turn to the issue of whether City Attorney Flandrick and City Planning Director Porter are immune from the actions they took in promoting the reenactment of the ordinance. The district court found that Porter and Flandrick were not entitled to either absolute or qualified immunity. We review that determination de novo. Greater Los Angeles Council on Deafness, Inc. v. Zolin, 812 F.2d 1103, 1107 n. 6 (9th Cir.1987); White by White v. Pierce County, 797 F.2d 812, 814-15 (9th Cir.1986).
 
 
 34
 We hold that Porter and Flandrick are entitled to qualified immunity and, thus, we do not reach the issue of whether absolute immunity is appropriate under these circumstances. Government officials enjoy qualified immunity from liability under 42 U.S.C. Sec. 1983 unless their conduct violated "clearly established ... constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (emphasis added). "If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." Id. The test is wholly objective, and we do not inquire into the actual subjective intent of the official. Davis v. Scherer, 468 U.S. 183, 191, 104 S.Ct. 3012, 3017, 82 L.Ed.2d 139 (1984). Thus, our inquiry is whether Walnut's First Amendment rights were clearly established so that a reasonable person would have known that the reenactment of the ordinance would amount to a constitutional violation. We hold that Walnut's rights were not so clearly established.
 
 
 35
 In rejecting Porter's and Flandrick's claim of qualified immunity, the district court found that Walnut's rights were "clearly established" by the district court's judgment in Walnut 1, which found the original ordinance unconstitutional; Walnut makes this same argument on appeal. The Walnut 1 decision did not clearly establish the law with respect to the issues raised in Walnut 2 for several reasons. The district court found the first ordinance unconstitutional because the City failed to prove that the 1,000-foot separation requirement between a church and an adult theater "further[ed] a compelling government interest" and "because a motivating factor [behind the requirement] was to restrict the exercise of First Amendment rights...."[10] The defendants attempted to cure the constitutional defects of the first ordinance by conducting a new study to demonstrate that the ordinance furthered a compelling interest. Moreover, the district court's finding of improper motive with respect to the first ordinance could not necessarily apply to the second ordinance because the latter was passed in light of the new study. Thus, the district court's opinion in Walnut 1 could not have "clearly established" that the second ordinance would violate Walnut's rights. We note, however, that the two ordinances were identical in terms of their allowance of alternative sites. But because the district court in its original decision in Walnut 1 did not rest its holding on the inadequacy of available alternatives, the decision did not clearly establish the law in that respect. In sum, the district court erred when it held that Walnut 1 "clearly established" rights so as to defeat immunity.
 
 
 36
 We therefore must disregard the original decision in Walnut 1 when we assess the state of the law at the time the City passed the second ordinance. Absent binding precedent, we look at "all available decisional law including decisions of state courts, other circuits, and district courts to determine whether the right was clearly established.... An additional factor is the likelihood that the Supreme Court or the Ninth Circuit would have reached the same result as courts that had already considered the issue." Ward v. County of San Diego, 791 F.2d 1329, 1332 (9th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987). See also Capoeman v. Reed, 754 F.2d 1512, 1514-15 (9th Cir.1985) (as amended). We must, therefore, ask whether other decisions had "clearly established" that the second ordinance passed by the City was unconstitutional.
 
 
 37
 Surveying the cases that existed in 1984, we note that several courts elucidated broad principles of First Amendment law, but few applied those principles to circumstances similar to those at hand. We recognize that the constitutionality of zoning ordinances frequently depend upon the factual situations involved; a 1,000-foot separation requirement between churches and adult businesses may be found constitutional in one instance and unconstitutional in the next, depending on the evidence supporting the need for such a provision, the motivations propelling its enactment, and the extent to which the restriction allows alternative locations for communicating the protected expression.
 
 
 38
 We begin our analysis by pointing out that our inquiry for the purposes of qualified immunity extends beyond the scope of our discussion relating to the constitutionality of the ordinance. We found the ordinance unconstitutional on the basis that it failed to leave open adequate alternatives of communication. We thus did not need to address whether it was unconstitutional on the other grounds found by the district court--those relating to motive and to the sufficiency of the evidence supporting the ordinance. However, in order to find that the defendants are entitled to qualified immunity, we must venture into those areas to a limited extent. Our task is to determine whether, assuming the ordinance is unconstitutional on those other two grounds as well, the law was so clearly established at the time that the City should have known that passing the ordinance violated Walnut's First Amendment rights.
 
 
 39
 We have no difficulty concluding that the law as of 1984 failed to clearly establish the role of motive in constitutional analysis. The issue had surfaced primarily in this circuit, but the cases which discussed motive in some depth did so only in the context of reviewing a grant of summary judgment or a denial of a preliminary injunction. In Ebel v. City of Corona, 698 F.2d 390, 393 (9th Cir.1983), we determined that there existed sufficient evidence of an improper motive on behalf of a city that enacted an adult ordinance, to present "fair ground for litigation." And in Tovar v. Billmeyer, 721 F.2d 1260, 1265 (9th Cir.1983), cert. denied, 469 U.S. 872, 105 S.Ct. 223, 83 L.Ed.2d 152 (1984), we found that a genuine issue of material fact existed as to whether zoning decisions affecting adult businesses were improperly motivated. See also Kuzinich v. County of Santa Clara, 689 F.2d 1345, 1348 (9th Cir.1983) (as amended). In neither case were we in the position to set forth definitively the role that motivation would play in determining whether zoning ordinances were unconstitutional.
 
 
 40
 Similarly, the law as of mid-1984 had not clearly established what constituted a legitimate need for an adult ordinance or even whether a legitimate need was required. At least one case held that an ordinance was constitutional even if the city did not set forth any factual basis for its ordinance. See Strand Property Corp. v. Municipal Court, 148 Cal.App.3d 882, 887, 200 Cal.Rptr. 47 (1983) (as modified). Other courts held the opposite, finding that the ordinance could be sustained only if there existed some factual basis for the purported governmental interest served by the ordinance. See, e.g., North Street Book Shoppe v. Village of Endicott, 582 F.Supp. 1428, 1434-35 (N.D.N.Y.1984); E & B Enterprises v. City of University Park, 449 F.Supp. 695, 696-97 (N.D.Tex.1977); and Keego Harbor Co. v. City of Keego Harbor, 657 F.2d 94, 98-99 (6th Cir.1981). But none of those cases indicated sufficiently clearly what factors justified an ordinance regulating adult businesses. The City passed its ordinance on the basis of a second study, thus offering at least some factual basis for its ordinance. At the time, there were no clear guidelines indicating whether its study contained sufficiently probative evidence to support a finding that the ordinance was constitutional. Thus, even if the ordinance is unconstitutional for lack of sufficient reasons supported by adequate evidence, we can hardly say that the law clearly established such a defect at the time the second ordinance was passed.
 
 
 41
 Finally, we must determine whether the law clearly established that the ordinance left open insufficient alternative avenues of communication. By the time the City passed the second ordinance, several courts had held that various ordinances impermissibly restricted First Amendment rights by failing to provide adequate alternative locations for adult businesses. See, e.g., North Street Book Shoppe, 582 F.Supp. at 1432; CLR Corp., 702 F.2d at 639; Bayside Enterprises, Inc. v. Carson, 450 F.Supp. 696, 703 (M.D.Fla.1978); E & B Enterprises, 449 F.Supp at 697; Alexander, 698 F.2d at 939; and Basiardanes, 682 F.2d at 1214. However, the decisions in those cases, by focusing on the availability of alternative sites, necessarily turned upon the particular geographical characteristics of the city involved. To extract from those few cases clear principles of constitutional law would be to impose an altogether unrealistic burden on officials who are held only to the reasonable person standard.[11] As we recognized in Ward, when evaluating whether the law was clearly established at the time officials acted, we do not "require of most government officials the kind of legal scholarship normally associated with law professors and academicians. A reasonable person standard adheres at all times." Ward, 791 F.2d at 1332.
 
 
 42
 Moreover, even if the "relevant decisional law at the time of the incident favors [plaintiff's] position," it still may be unclear whether the defendants "should be charged with knowledge of 'clearly established' law." Capoeman, 754 F.2d at 1514, 1515. In Capoeman, we refrained from holding that the pertinent law was clearly established even though there were three cases from other circuits and three district court cases that established the right in question. See id. at 1514. We stated that, where there are "relatively few cases on point, and none of them are binding, an additional factor that may be considered in ascertaining whether the law is 'clearly established' is a determination of the likelihood that the Supreme Court or this circuit would have reached the same result as courts which had previously considered the issue. To make the determination, we examine the legal analysis employed by those courts and compare it to the analysis being used at that time by the Ninth Circuit in related but factually different situations." Id. at 1515. We do not mean to suggest that three out-of-circuit cases or even one may not be enough to show that the law is clearly established. Rather, we reaffirm only that in such circumstances we may be required to evaluate the prospects that the Supreme Court or our court will agree.
 
 
 43
 Here, there were virtually no cases in the Ninth Circuit discussing the standard to be applied in assessing the adequacy of alternative locations for adult businesses. In Playtime Theaters, Inc., 748 F.2d at 527, decided months after the City passed the second ordinance, we noted in a footnote that this circuit had not previously considered the question. Id. at 534 n. 11. While in other types of cases the absence of prior Ninth Circuit analysis of the relevant issues might not preclude a finding that the law was clearly established, given all of the circumstances of this case, we cannot reach that result here. Without any indication of what analysis this circuit would employ, the defendants could not be expected to extrapolate a clear rule from the variety of circumstances faced by other courts. We hold that the law in existence at the time of the defendants' actions failed to establish clearly that the second ordinance was unconstitutional. The defendants are therefore entitled to qualified immunity.
 
 CONCLUSION
 
 44
 We affirm the district court's finding that the ordinance is unconstitutional on the basis that it fails to allow adequate alternative locations for Walnut's theater. We also affirm the district court's decision not to abstain. However, we reverse the district court's denial of qualified immunity, because we hold that the law did not clearly establish that the second ordinance was unconstitutional at the time it was enacted. We affirm all awards of attorneys' fees in both actions.
 
 
 45
 AFFIRMED IN PART, AND REVERSED IN PART.
 
 
 
 [1]
 Although the two actions here involve two separate ordinances, this is irrelevant for our purposes. The second ordinance, No. 2327, was identical in substance to the first ordinance, No. 2257. Though the second ordinance could be distinguished from the first on the basis that an additional study purportedly justified its enactment, this distinction has no bearing on our holding. We rest our decision on the basis that neither ordinance left open adequate alternative channels of expression. The two ordinances were identical in that respect, and thus we need not concern ourselves with which ordinance is the focus of our constitutional inquiry. Accordingly, mootness is not an issue here. See Tollis, Inc. v. San Bernardino County, 827 F.2d 1329, 1331-32 (9th Cir.1987) ("Since the relevant requirements of the temporary ordinance have been manifestly preserved unchanged in [the later ordinance], the controversy before us is not moot.")
 
 
 [2]
 In this vein, the City also argues that the California Court of Appeal's decision in this case should operate as res judicata to bar our determination of the constitutional issues. This is the third time the City attempts to make such an argument. We rejected the City's contention when we first heard the Walnut 1 appeal. When the case was again before us on remand from the Supreme Court, we expressly reinstated that part of our vacated memorandum disposition. See Walnut Properties, 808 F.2d at 1333 n. 1. Our view on the matter has not changed. We note also that the basis on which we hold the ordinance unconstitutional--namely that it fails to provide adequate alternative locations--was an issue never even resolved by the California Court of Appeal. That court expressly remanded the case to the trial court to make factual determinations regarding alternative sites, and those proceedings have been stayed. See City of Whittier v. Walnut Properties, Inc., 149 Cal.App.3d 633, 644-45, 197 Cal.Rptr. 127 (1984) (directing the trial court on remand to "make the necessary rulings ... as to the availability of alternate sites in the City of Whittier....")
 
 
 [3]
 Indeed, in its brief, the City never asserts that it raised this issue on appeal. It simply maintains that it raised the issue to the district court both initially and on remand
 
 
 [4]
 A circle with a radius of 1,000 feet encompasses approximately 72 acres
 
 
 [5]
 In so doing, the map incorporates Mr. Porter's presumptions regarding the availability of certain sites under the ordinance--presumptions which were set forth in his testimony at trial
 
 
 [6]
 One of these areas may not be available for adult businesses, but for the purposes of our analysis we shall assume it is. The availability of space within the Whitwood Shopping Center was in dispute at trial. The shopping center consists of 30 parcels. Parts of the shopping center are within 500 feet of a residential zone. An adult business could locate within the center unless the shopping center is considered a single lot under the City's zoning plan. If the center is viewed as one single lot, the entire area is considered within 500 feet of a residential zone and the center is precluded from providing a location for an adult business. See RT at 69. The district court never reached a conclusion on whether, as a matter of zoning law, the shopping center could be considered one lot or a group of separate lots. We need not address whether the shopping center provides an area in which adult businesses could locate. Instead, we assume it does, as the addition of one area does not significantly increase the availability of alternative sites so as to boost the ordinance above the threshold of constitutionality
 
 
 [7]
 Unlike the ordinance at bar, however, the Detroit ordinance in Young imposed a 1,000-foot separation requirement between one adult theatre and any two other regulated uses. Id. 472 U.S. at 52, 96 S.Ct. at 2443. Thus, the Detroit ordinance was far less restrictive than the Whittier one
 
 
 [8]
 Though only a plurality joined in the opinion, Justice Powell expressly pointed out in his concurrence that the ordinance did not involve "any significant overall curtailment of adult movie presentations, or the opportunity for a message to reach an audience." Young, 427 U.S. at 79, 96 S.Ct. at 2456 (Powell, concurring). See also Basiardanes, 682 F.2d at 1214 (discussing Young )
 
 
 [9]
 In his concurrence, Justice Powell noted, "On the basis of the District Court's finding ... it appears that if a sufficient market exists to support [adult theaters], the number of adult movie theaters in Detroit will remain approximately the same, free to purvey the same message." Young, 427 U.S. at 79, 96 S.Ct. at 2456. See also Alexander, 698 F.2d at 938 (discussing Young ). A majority of the Court later distinguished an ordinance banning nude dancing from the one in Young, noting that the Detroit ordinance "did not affect the number of adult movie theaters that could operate in the city...." Schad v. Borough of Mt. Ephriam, 452 U.S. 61, 71, 101 S.Ct. 2176, 2184, 68 L.Ed.2d 671 (1981)
 
 
 [10]
 In its first decision, the district court did not rest its holding, in part, on the lack of alternative sites. This circuit, however, affirmed the district court's finding of unconstitutionality partially on that basis
 
 
 [11]
 Of course, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful...." Anderson v. Creighton, --- U.S. ----, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). The fact-specific nature of First Amendment analysis does not automatically shield public officials with qualified immunity for First Amendment violations whenever the facts are in any degree different. Roth v. Veteran's Admin., 856 F.2d 1401, 1408 (9th Cir.1988)