George ISBELL, Jr.; G and B Emporia Incorporated, dba Adult Emporium No. 1, Plaintiffs–Appellants,

v.

CITY OF SAN DIEGO, a municipal corporation, Defendant–Appellee.

No. 99–55591.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 15, 2000

Filed July 31, 2001

John B. Barriage, San Diego, California, for the plaintiffs-appellants.

Carra L. Lassman, Deputy City Attorney, San Diego, California, for the defendant-appellee.

Before: CANBY, MCKEOWN, and PAEZ, Circuit Judges.

CANBY, Circuit Judge:

This case presents a constitutional challenge to the City of San Diego's adult entertainment zoning ordinance. The appellant, George Isbell, Jr., contends that the City's ordinance violates the First Amendment and the Equal Protection Clause by preventing him from operating an adult entertainment business.[1] The district court granted summary judgment for the City on all claims.

We affirm the award of summary judgment to the City on two of Isbell's claims. We reverse, however, the summary judgment for the City on one of Isbell's First Amendment claims. We conclude that the City has not adduced sufficient evidence to establish that there are "reasonable alternative avenues of communication" in San Diego, and the City accordingly is not entitled to summary judgment on that claim. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 50, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986).

## BACKGROUND

In 1997, Isbell purchased a building in San Diego with the intention of opening an adult entertainment establishment there. Because this building was located within 1000 feet of a residential area, however, a

---

1. Isbell's corporation, G & B Emporia, Inc., is also a plaintiff, but we use the singular "Isbell" for convenience.

San Diego zoning ordinance precluded him from operating there. *See* San Diego Mun.Code. § 101.1810. Isbell applied for a variance, but was unsuccessful. He then filed this action, arguing that the City's ordinance violates the First Amendment, and that its standards for variances violate the Equal Protection Clause. The district court awarded summary judgment to the City on all claims.

## DISCUSSION

■■■ We review de novo the district court's award of summary judgment. *See Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir.2000) (en banc). For purposes of summary judgment, we must consider the evidence in the light most favorable to Isbell, the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### I. First Amendment Challenge— Reasonable Alternatives.

The San Diego ordinance in issue is designed to separate adult entertainment establishments from each other and from several other types of uses. It provides, in pertinent part:

> No person shall cause or permit the establishment, enlargement or transfer of ownership or control of any adult establishment if such establishment is within 1000 feet of another such business, 1000 feet of any residential zone, or within 1000 feet of any church, school, public park or social welfare institution within the City of San Diego.

San Diego Mun.Code § 101.1810. This "separation" approach was initially upheld by the Supreme Court in *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), (plurali-

ty opinion) and we have subsequently addressed ordinances identical or similar to the San Diego ordinance. *See, e.g., Walnut Properties, Inc. v. City of Whittier*, 861 F.2d 1102 (9th Cir.1988); *Diamond v. City of Taft*, 215 F.3d 1052 (9th Cir.2000); *Lim v. City of Long Beach*, 217 F.3d 1050 (9th Cir.2000).

■■■ Dispersal ordinances of this type that are aimed at controlling the secondary effects of adult establishments are constitutional if they are "designed to serve a substantial governmental interest and allow[ ] for reasonable alternative avenues of communication." *See City of Renton*, 475 U.S. at 50, 106 S.Ct. 925. Isbell does not dispute that San Diego's ordinance generally is designed to serve a substantial governmental interest; he argues only that it does not offer reasonable alternative avenues. That claim can be addressed only by analyzing the effect of the ordinance under the actual conditions prevailing in the City. *See id.* at 53, 106 S.Ct. 925. The burden of persuasion is on the City to demonstrate that its ordinance provides reasonable alternative avenues of communication. *See Lim*, 217 F.3d at 1054.[2]

■■■ To decide whether constitutionally sufficient alternatives exist, we first have to determine how many alternative sites are available, *see Walnut Properties*, 861 F.2d at 1108, and then determine whether that number is sufficient to afford adult establishments a reasonable opportunity to locate, *see Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1532–33 (9th Cir.1993).

### (a) The number of alternative sites available.

■■■ For sites to be available, they must be in the "actual business real estate

---

**2.** The district court, not having the benefit of our subsequent decision in *Lim*, improperly assumed that Isbell bore the burden of demonstrating that the City did not provide reasonable alternative avenues of communication.

market." *Lim,* 217 F.3d at 1055.[3] Here, the City presented a list of 110 parcels, constituting approximately 92 acres, that it asserted were available for adult entertainment establishments.[4] Isbell examined these sites and asserted that only 3 were actually available. Isbell's figure, however, is flawed. He contends, for example, that parcels occupied by such businesses as car dealerships or plumbing supply outlets could not be part of the relevant business real estate market because they were not economically suited for his business. But "it is not relevant whether a ... site will result in lost profits, higher overhead costs, or even prove to be commercially infeasible for an adult business. The issue is whether any site is part of an actual market for commercial enterprises generally." *Topanga Press,* 989 F.2d at 1531. Isbell also excluded sites occupied by existing adult entertainment businesses and other sites under lease. Although a long-term lease may exclude a site from the commercial market, *see Lim,* 217 F.3d at 1055, Isbell did not take the length of leases into consideration, thereby disregarding the fact that those sites could be potentially available. He also excluded vacant lots from his tally of available sites. Isbell's survey accordingly cannot be relied upon, and we reject his contention that 107 of the 110 sites offered by the City were outside the commercial real estate market.[5]

 The City's list of 110 sites is subject, however, to a different and fatal flaw. It ignored the separation requirement of 1000 feet between adult establishments. In determining the number of sites available for adult businesses, that requirement must be taken into account. *See Walnut Properties,* 861 F.2d at 1108. There is no question that, when this separation requirement is taken into account, far fewer than 110 adult businesses could operate at the City-identified sites; indeed, the City conceded that point at oral argument. Because the separation requirement was not taken into account, the record provides no means of determining just how many of the 110 sites are actually available.

3. Some relevant considerations in determining whether a site is reasonably within the business real estate market are: "(1) a relocation site is not part of the market if it is 'unreasonable to believe that it would ever become available to any commercial enterprise;' (2) a relocation site in a manufacturing or industrial zone that is 'reasonably accessible to the general public' may also be part of the market; (3) a site in a manufacturing zone that has proper infrastructure may be included in the market; (4) a site must be reasonable for some generic commercial enterprise, although not every particular enterprise, before it can be considered part of the market; and (5) a site that is commercially zoned is part of the relevant market.... In addition, a site must obviously satisfy the conditions of the zoning ordinance in question." *Lim,* 217 F.3d at 1055 (quoting *Topanga Press,* 989 F.2d at 1531).

4. The study performed by the City examined only two communities, and apparently disregarded 43 out of the 45 communities in San Diego. These two communities were selected because they had the highest concentration of adult entertainment businesses. In arriving at the conclusion that there were 45 existing adult businesses in San Diego, however, the City apparently examined two additional neighborhoods.

The City faults Isbell for surveying only the communities that San Diego studied in its own report. Isbell, however, is not obligated to show a lack of alternatives in the unstudied communities. Instead, these communities are presumed to have no available sites, because the initial burden to demonstrate available sites rests on the City.

5. If the City had provided "a good faith and reasonable list of potentially available properties," it would then become Isbell's burden to show that "certain sites would not reasonably become available." *Lim,* 217 F.3d at 1055. For reasons shortly to be explained, however, we conclude that the City did not provide a reasonable list of potentially available properties.

It is not appropriate in this case to regard Isbell in isolation, and conclude that he, acting alone, could locate his establishment at any of the 110 spots that is not within 1000 feet of an existing adult business. It is true that in *Diamond*, 215 F.3d at 1052, we considered the plaintiff alone and concluded that all seven sites identified by the city were available to him, even though seven adult businesses could not operate simultaneously on those sites because of a separation requirement. But *Diamond* was a special case: Diamond was the first person even to seek to open an adult business in the City of Taft. *See id.* at 1057–58. In *Lim,* decided the same day as *Diamond,* we reviewed a decision in which the district court had determined that, on the 115 sites identified by the City, only 27 or 28 adult businesses could coexist. Although we reversed in part and remanded on another ground, we did not reject the district court's application of the separation requirement to determine how many sites were actually available to adult businesses *considered collectively.* In so doing, we followed the procedure we originally adopted in *Walnut Properties* of considering the number of sites available to all adult businesses simultaneously when the separation requirement is taken into account. *See Walnut Properties,* 861 F.2d at 1108.

Because the City of San Diego did not account for separation in offering its list of 110 sites, and the record does not show what the effect of the separation requirement would be on those sites, we cannot accept 110 as the number of available sites for the purposes of this summary judgment. The greatest number of available sites that the record supports is therefore 45–the approximate number of existing adult businesses in San Diego.

(b) Sufficiency of available sites.

 On this record, we cannot conclude that 45 sites suffices to establish "reasonable alternative avenues of communication" within the meaning of *City of Renton,* 475 U.S. at 50, 106 S.Ct. 925. In the first place, the City here has offered no evidence of total demand, which we have held to be an important factor to be compared with supply in determining the adequacy of alternative avenues of expression. *See Young v. City of Simi Valley,* 216 F.3d 807, 822 (9th Cir.2000). This is not to say that San Diego's ordinance will be automatically constitutional if demand does not exceed the supply of sites, because such a conclusion "is insufficient to account for the chilling effect that an adult use zoning ordinance may have on prospective business owners." *Id.* As *Young* explained:

> [S]upply and demand should be only one of several factors that a court considers.... A court should also look to a variety of other factors including, but not limited to, the percentage of available acreage theoretically available to adult businesses, the number of sites potentially available in relation to the population, "community needs, the incidence of [adult businesses] in other comparable communities, [and] the goals of the city plan."

*Id.* (quoting *International Food & Beverage Sys. v. City of Fort Lauderdale,* 794 F.2d 1520, 1526 (11th Cir.1986)).

In the present case, such a comprehensive and collective analysis is clearly called for. It has not been done. In its absence, we have no way of concluding that reasonable alternative avenues of communication exist in San Diego. As the record now stands, we can postulate a demand for at least 46 sites, arising from the operators of the 45 existing sites along with Isbell. If that number is used for demand and 45 sites is the supply, and at present we have no other numbers, then the number de-

manded exceeds the supply. If that is the situation, it is a factor favoring Isbell. Moreover, the 45 existing businesses represent a decline from 90 such businesses in existence in 1984, when the challenged ordinance was adopted. Whether that decline was due to a chilling effect of the ordinances or some other cause is not clear from the record. Nor is there evidence of the number of adult businesses in comparable communities, or the other factors this court set forth in *Young*, 216 F.3d at 822.

On the present record, then, the City has failed to establish that reasonable alternative avenues of communication exist in San Diego under the challenged ordinance. We therefore reverse the summary judgment in favor of the City on this First Amendment claim, and remand for further appropriate proceedings.

## II. First Amendment Challenge Regarding Existing Site.

Isbell also argues that, regardless of whether the San Diego zoning regulations leave open "reasonable alternative avenues of communication," the rule requiring a 1000–foot separation between residential areas and adult businesses violates the First Amendment in his case. His contention is that, because a freeway runs between his property and the residential neighborhood 900 feet away, there is no reason to enforce the 1000–foot rule against his property. Because this freeway would dissipate the secondary effects of his business, Isbell argues, the 1000–foot rule serves no valid purpose in his case, and thus it violates the First Amendment. *See United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (time, place and manner restriction on speech must serve substantial government interest).

■ The appropriate question, however, is not whether the 1000–foot require-ment is perfectly tailored to Isbell's case; it is whether the 1000–foot requirement generally serves a substantial government interest. That question was answered in *City of Renton*, 475 U.S. at 50, 106 S.Ct. 925, which recognized a strong city interest in preserving the quality of urban life. "Cities may regulate adult theatres by dispersing them, as in Detroit, or by effectively concentrating them, as in Renton." *Id.* at 52, 106 S.Ct. 925.

■ We cannot accept Isbell's invitation to explore whether the 1000–foot limit is appropriate to his particular site. Any application of a 1000–foot rule will have varying effects in each situation; if each must be examined and exceptions tailored, there will be nothing left of the 1000–foot rule approved by the Supreme Court in *American Mini Theatres*, 427 U.S. at 72, 96 S.Ct. 2440 (plurality opinion), 84 (concurring opinion). We conclude that, so long as the City provides reasonable alternative avenues of communication, it may require adult businesses without exception to be located more than 1000 feet from a residential area. The district court accordingly was correct in granting the City summary judgment on this claim, and we affirm that part of its judgment.

## III. Equal Protection Claim

Isbell also contends that San Diego violated his right to equal protection of the laws by employing variance standards that are more stringent for adult entertainment businesses than for non-adult businesses. Isbell points to the fact that the City can take into account the mitigating effect that barriers, such as freeways, have on the secondary effects of a business when deciding whether to grant a variance to most businesses, but cannot do so when deciding whether to grant a variance to adult entertainment businesses. Had the City taken into account the mitigating effect of the

freeway adjacent to Isbell's property when ruling on his request for a variance, Isbell argues, he would have been granted a variance. Isbell therefore argues that his right to equal protection was violated.

 We reject this equal protection challenge, and affirm the district court's award of summary judgment on this count. The Supreme Court has made clear that ordinances such as San Diego's, directed at the secondary effects of adult businesses, are permissible time, place and manner regulations. *City of Renton,* 475 U.S. at 51–52, 106 S.Ct. 925. So long as alternative avenues of expression are provided, a city may choose to treat adult businesses differently from other businesses, *see id.,* and even may treat one category of adult businesses differently from other categories of adult businesses, *see id.* at 52–53, 106 S.Ct. 925.

 Although *City of Renton* dealt with a First Amendment challenge to a separation ordinance, its speech-neutral reason for permitting adult businesses to be treated differently from others also refutes an equal protection challenge. A regulation of secondary effects of adult businesses is not a regulation of content; a classification of adult businesses therefore does not impinge on a fundamental right, nor does it involve a suspect classification. The ordinance may therefore survive an equal protection challenge if it has a rational basis. Under rational basis analysis, a "classification 'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.' A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification." *Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (citations omitted). Here, there is a reasonably conceivable basis for the City's differing variance standards: the secondary effects of

adult businesses are arguably more extreme than those of other businesses. *See Lim,* 217 F.3d at 1056–57 (city's interest in curbing secondary effects of adult businesses justifies enforcing adult business ordinance while not enforcing other zoning ordinances). The district court accordingly did not err in awarding summary judgment to the City on this claim, and we affirm that ruling.

### CONCLUSION

We affirm the judgment of the district court with regard to Isbell's First Amendment challenge to the application of the San Diego ordinance to his existing site, and with regard to his equal protection challenge. We reverse the judgment with regard to Isbell's First Amendment claim that San Diego fails to leave open to adult businesses reasonable alternative avenues of communication, and we remand for further proceedings on that claim.

Isbell is entitled to his costs on this appeal.

**AFFIRMED IN PART; REVERSED IN PART, AND REMANDED.**