**WORLD WIDE VIDEO OF WASHINGTON, INC.,**
Plaintiff,

v.

**CITY OF SPOKANE, Defendant.**

No. CS–02–074–AAM.

United States District Court,
E.D. Washington.

Sept. 11, 2002.

1144

Gilbert Henry Levy, Seattle, WA, for World Wide Video of Washington, Inc.

Stephen Alan Smith, Todd L. Nunn, Preston Gates & Ellis, LLP, Timothy Szambelan, Assistant City Attorney of the City of Spokane, Seattle, WA, for defendant.

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, INTER ALIA

MCDONALD, Senior District Judge.

**BEFORE THE COURT** is defendant's Motion for Summary Judgment (Ct. Rec.32) and Motion to Strike Expert Declarations of R. Bruce McLaughlin and Rich Crisler (Ct.Rec.64). These motions were heard with oral argument on August 22, 2002. Gilbert H. Levy, Esq., appeared for plaintiff. Stephen A. Smith, Esq., Todd L. Nunn, Esq., and Timothy E. Szambelan, Esq., appeared for defendant.

### I. BACKGROUND

This is a 42 U.S.C. § 1983 action in which plaintiff contends that City of Spokane Ordinances 32778 and 33001 ("the Ordinances") violate its First and Fourteenth Amendment rights. Plaintiff seeks injunctive and declaratory relief and damages.

### II. FACTS

Defendant City of Spokane staff and outside counsel assembled a legislative record to support the regulation of adult retail businesses.

On November 29, 2000, the City Plan Commission held a public hearing to consider testimony regarding amendments to the Spokane Municipal Code (SMC) regarding Adult Retail Use Establishments. The city attorney's office presented the legislative record and provided the Plan Commission an overview of the secondary impacts of Adult Retail Use Establish-

ments on the community. Fourteen people testified at the hearing.

On December 13, 2000, the Plan Commission considered the public comments and the legislative record and voted 6 to 0 to recommend approval of the proposed amendment to the City Council.

On January 29, 2001, the Spokane City Council unanimously passed Ordinance 32778. This ordinance changed the definition of "Adult Business" in Spokane Municipal Code (SMC) § 11.17.426 to regulate "adult retail use establishments" rather than "adult bookstore[s]." It also removed the definition of "adult bookstore" from SMC § 11.19.03023 and added a definition of "adult retail use establishment." According to § 11.19.03023:

A. An "adult retail use establishment" is an enclosed building, or any portion thereof which, for money or any other form of consideration, devotes a significant or substantial portion of stock in trade, to the sale, exchange, rental, loan, trade, transfer, or viewing of "adult oriented merchandise."

B. "Adult oriented merchandise" means any goods, products, commodities, or other wares, including but not limited to, videos, CD ROMS, DVDs, computer disks or other storage devices, magazines, books, pamphlets, posters, cards, periodicals or non-clothing novelties which depict, describe or simulate specified anatomical areas, as defined in Section 11.19.0355, or specified sexual activities, as defined in Section 11.19.0356.

"Adult retail use establishment[s]" are subject to the distancing requirements of SMC § 11.19.143 which was amended to include such establishments and now reads:

1. An adult retail use establishment and an adult entertainment establishment may not be located or maintained within seven hundred fifty feet, measured from the nearest building of the adult retail use establishment or of the adult entertainment establishment to the nearest building of any of the following pre-existing uses:

a. public library

b. public playground or park

c. public or private school and its grounds, from kindergarten to twelfth grade,

d. nursery school, mini-day care center, or day care center,

e. church, convent, monastery, synagogue, or other place of religious worship,

f. another adult retail use establishment or an adult entertainment establishment, subject to the provisions of this section.

2. An adult retail use establishment or an adult entertainment establishment may not be located within seven hundred fifty feet of any of the following zones:

a. agricultural,

b. country residential,

c. residential suburban,

d. one-family residence,

e. two-family residence,

f. multifamily residence (R3 and R4),

g. residence-office.

Ordinance 32778 also added a new section to Title 11 of the SMC by providing for an amortization period of 12 months for adult retail use establishments made nonconforming by the code amendment. A mechanism to extend the amortization period was also provided.

The City then determined it needed to provide more sites for the relocation of adult businesses under Ordinance 32778.

The Plan Commission held four hearings (December 12, 2001, December 19, 2001, January 9, 2002, and February 13, 2002) to determine where to locate additional sites. The City Council held a public hearing to consider passage of Ordinance 33001. The Ordinance passed on a vote of five to two.

Plaintiff World Wide Video (WWV) owns three businesses which are affected by the Ordinances. The addresses of these businesses, named either the Hollywood Erotique Boutique or World Wide Video, are 3813 N. Division, 4811 N. Market and 1811 E. Sprague. Each of these businesses is an "adult retail use establishment" under SMC § 11.19.03023.

Ordinance 32778 became effective on March 10, 2001 and therefore, all non-conforming adult retail use establishments were to be terminated by March 10, 2002 (12 months from the effective date of Ordinance 32778). WWV filed an application with the City Planning Director (John Mercer) for an extension of the amortization period. The Planning Director granted a six month extension for each of WWV's properties. WWV filed appeals to the Hearing Examiner under SMC § 11.19.395. The Hearing Examiner denied the appeals in part and held the six month extension commenced on the date of his decision (May 15, 2002). Therefore, as of this time, WWV must terminate its businesses at the aforementioned locations no later than November 15, 2002. Plaintiff has appealed the Hearing Examiner's ruling to Spokane County Superior Court under the Land Use Petition Act, RCW 36.70C.005 et seq.

## III. DISCUSSION

### A. Summary Judgment Standard

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.), *cert. denied,* 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975). Under Fed. R.Civ.P. 56, a party is entitled to summary judgment where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir.1985). Summary judgment is precluded if there exists a genuine dispute over a fact that might affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

The moving party has the initial burden to prove that no genuine issue of material fact exists. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* The party opposing summary judgment must go beyond the pleadings to designate specific facts establishing a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In ruling on a motion for summary judgment, all inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. Nonetheless, summary judgment is required against a party who fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual disputes regarding other elements of the claim. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548.

### B. First Amendment– Time, Place, and Manner Analysis

Defendant contends there are no genuine issues of material fact precluding this

court from finding as a matter of law that its Ordinances are content neutral and supported by a substantial governmental interest; the Ordinances allow a sufficient number of sites for plaintiff's businesses to relocate; the Ordinances are not vague or overbroad; and the amortization provision is valid and satisfies due process.

Plaintiff contends there are genuine issues of material fact as to each of these propositions which precludes summary judgment and requires the court to conduct a trial.[1]

■■■ Zoning ordinances designed to combat the undesirable secondary effects of adult entertainment businesses are analyzed as "time, place, and manner" restrictions on speech. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 49, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), citing with approval *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 70, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976).[2] A city may impose reasonable restrictions on the time, place or manner of protected speech, provided the restrictions are content neutral, narrowly tailored to serve a significant government interest, and leave open ample alternative channels for communication of the information. *Colacurcio v. City of Kent*, 163 F.3d 545, 551 (9th Cir.1998), *cert. denied*, 529 U.S. 1053, 120 S.Ct. 1553, 146 L.Ed.2d 459 (2000).

## 1. Are the Ordinances Content Neutral?

■■ A zoning ordinance is analyzed as a time, place, and manner restriction on speech "if the predominant purpose of the ordinance is the amelioration of secondary effects in the surrounding community." *Id.* at 551. Secondary effects are "regulatory targets that happen to be associated with the type of speech." *Boos v. Barry*, 485 U.S. 312, 320, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988).

Plaintiff contends that is not the predominant purpose of the Ordinances at issue in this case and indeed, that the Ordinances are a pretext for suppressing protected speech. Plaintiff relies on the Supreme Court's recent decision in *City of Los Angeles v. Alameda Books*, 535 U.S. 425, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002), and suggests that *Alameda Books* represents a new and different approach to the constitutional analysis of adult entertainment zoning ordinances. While *Alameda Books* may clarify existing precedent, this court is not persuaded that it fundamentally alters the legal landscape regarding adult entertainment zoning ordinances.[3]

The plurality opinion in *Alameda Books* observed that the *Renton* analysis distinguishes the inquiry into whether a municipal ordinance is content neutral from the

---

1. Plaintiff's First Amended Complaint requests that a jury hear damages issues only.

2. Regulations enacted for the purpose of restraining speech on the basis of its content are presumptively in violation of the First Amendment. In order to overcome that presumption, they must pass the "strict scrutiny" test which requires there be a compelling governmental interest. Time, place and manner restrictions are subject to "intermediate scrutiny" and require only a significant or substantial governmental interest. *Renton*, 475 U.S. at 46–47, 106 S.Ct. 925; *Z.J. Gifts*

*D–2, L.L.C. v. City of Aurora*, 136 F.3d 683, 686 (10th Cir.1998).

3. Plaintiff's expert, R. Bruce McLaughlin, comments on what he believes is the impact of the Supreme Court's decision in *Alameda Books* on previous federal court cases. He claims that in those cases, the burden would have shifted to the municipality and it could not have met its burden. (McLaughlin Report Vol. 1 at pp. 77–79). McLaughlin, however, is not qualified to render what are essentially legal opinions and conclusions.

inquiry into whether it is "designed to serve a substantial governmental interest and do[es] not unreasonably limit alternative avenues of communication." 122 S.Ct. at 1737, quoting *Renton,* 475 U.S. at 47–54, 106 S.Ct. 925. The former inquiry requires courts to verify that the "predominate concerns" motivating the ordinance "were with the secondary effects of adult [speech], and not with the content of adult [speech]." *Id.* quoting *Renton,* 475 U.S. at 47, 106 S.Ct. 925. The latter inquiry goes a step further and asks whether the municipality can demonstrate a connection between the speech regulated by the ordinance and the secondary effects that motivated the adoption of the ordinance. According to the Court, "[o]nly at this stage did *Renton* contemplate that courts would examine evidence concerning regulated speech and secondary effects." *Id,* citing *Renton,* 475 U.S. at 50–52, 106 S.Ct. 925.

It does not appear that Justice Kennedy, in his opinion concurring in the judgment, disagreed with the plurality. According to him, "whether a statute is content neutral or content based is something that can be determined on the face of it; if the statute describes speech by content then it is content based." *Id.,* 122 S.Ct. at 1741.

In *Z.J. Gifts D–2, L.L.C. v. City of Aurora,* 136 F.3d 683 (10th Cir.1998), *cert. denied,* 525 U.S. 868, 119 S.Ct. 162, 142 L.Ed.2d 133 (1998)[4], a district court invalidated a city zoning regulation requiring sexually oriented businesses to locate in industrially zoned areas. The district court held the regulation was a content based restriction on speech as applied to Z.J. Gifts' retail business which sold and leased adult videos and magazines for off-site viewing only. Therefore, the court

granted summary judgment in favor of the plaintiff, Z.J. Gifts.

The Tenth Circuit reversed. It found the regulation was content neutral, observing that in making that determination, the government's purpose in enacting the regulation is the controlling consideration. *Id.* at 686, citing *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). The record clearly established the city's purpose in enacting the ordinance: to regulate the harmful secondary effects of sexually oriented businesses. The preamble to the ordinance indicated the city's intent to protect its citizens from increased crime; preserve the quality of life, property values, and character of neighborhoods and businesses; deter the spread of urban blight; and protect against the spread of sexually transmitted diseases. *Id.*

■ Likewise in the case at bar, Spokane's predominate purpose in enacting its Ordinances is to regulate the harmful secondary effects of sexually oriented businesses. The Spokane City Plan Commission's findings, Attachment "A" to Ordinance C32778, includes a statement that the intent of the Ordinance is "to protect the general public health, safety and welfare of the citizenry of the City through the regulation of the location of adult retail establishments" and "to control health, safety, and welfare issues, the decline in neighborhood conditions in and around adult retail establishments, and to isolate dangerous an[d] unlawful conduct associated within these facilities." The findings make it equally clear that the intent of the Ordinance is not "to suppress any speech activities protected by the First Amendment to the United States Constitution, or Article 1, Section 5 of the Washington

---

4. *Z.J. Gifts* is part of Spokane's legislative record (SPO 000872 attached to Declaration of Tim Szambelan).

State Constitution, but to propose content neutral legislation which addresses the negative secondary impacts of adult retail use establishments." (See Legislative Record, SPO001480 et seq., attached to Declaration of Tim Szambelan).

Like the adult retail business in *Z.J. Gifts*, plaintiff World Wide Video contends that persons testifying in support of the Spokane Ordinances were biased against adult businesses and motivated by their objections to the speech itself, not the purported secondary effects. As the Tenth Circuit observed in *Z.J. Gifts*, however, alleged illicit motives hidden in comments will not support a determination that a restriction is content based. *Id.* at 687, citing *Renton*, 475 U.S. at 48, 106 S.Ct. 925. The actual motives of those who enact an ordinance are irrelevant to First Amendment analysis. In analyzing whether an ordinance violates the First Amendment, the court does not ask whether the motives of a municipal board or council can be justified as content-neutral time, place, and manner restrictions, but rather whether the ordinance itself can be so justified. *DiMa Corp. v. Town of Hallie*, 185 F.3d 823, 828–29 (7th Cir.1999). "It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *U.S. v. O'Brien*, 391 U.S. 367, 383, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

Based on the foregoing authorities and its examination of Spokane's Ordinances, this court finds those Ordinances are content neutral. Accordingly, they are subject to "intermediate scrutiny" and therefore, must be narrowly tailored to serve a substantial governmental interest and not unreasonably limit alternative avenues of communication.

**2. Are the Ordinances Narrowly Tailored to Serve a Substantial Governmental Interest?**

■ Municipalities may rely on any evidence that is "reasonably believed to be relevant" for demonstrating a connection between speech and a substantial governmental interest. *Alameda Books*, 122 S.Ct. at 1736, citing *Renton*, 475 U.S. at 51–52, 106 S.Ct. 925. The bar is not set that high because "municipalities will, in general, have greater experience with and understanding of the secondary effects that follow certain protected speech than will the courts." *Id.*, 122 S.Ct. at 1738. "[I]t is not [the court's] function to appraise the wisdom of [the city's] decision." *Renton*, 475 U.S. at 52, 106 S.Ct. 925. Legislative bodies are entitled to reasonable inferences suggested by the legislative record before them and as such, the court simply determines whether the ordinance "affects only categories of businesses reasonably believed to produce at least some of the unwanted secondary effects" the city seeks to regulate. *Z.J. Gifts*, 136 F.3d at 689, quoting *ILQ Investments, Inc. v. City of Rochester*, 25 F.3d 1413, 1418 (8th Cir.1994).[5] The court may not substitute its judgment for that of the legislature, usurping the legislative body's policy-making function. *Id.* Where the legislative record validates the legislature's judgment, the court's obligation to exercise independent judgment "is not a license to . . . replace [legislative] factual predictions with [the court's] own." *Id.*, quoting *Turner Broadcasting System v. FCC*, 512 U.S. 622, 666, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994).

**5.** *ILQ Investments* is part of Spokane's legislative record (SPO 000883 attached to Declaration of Tim Szambelan).

In his opinion concurring in the judgment in *Alameda Books,* Justice Kennedy stated:

Municipal governments know that high concentrations of adult businesses can damage the value and the integrity of a neighborhood. The damage is measurable; it is all too real. The law does not require a city to ignore these consequences if it uses its zoning power in a reasonable way to ameliorate them without suppressing speech. A city's "interest in attempting to preserve the quality of urban life is one that must be accorded high respect."

*Id.,* 122 S.Ct. at 1739, quoting *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 71, 96 S.Ct. 2440, 49 L.Ed.2d 310 (plurality opinion).[6] As such, a "city must have latitude to experiment, at least at the outset, and ... very little evidence is required." *Id.,* 122 S.Ct. at 1742–43, citing *Renton,* 475 U.S. at 51–52, 106 S.Ct. 925 ("The First Amendment does not require a city before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses"); *Young,* 427 U.S. at 71, 96 S.Ct. 2440 ("[T]he city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems"); and *Erie v. Pap's A.M.,* 529 U.S. 277, 297, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (City of Erie "could reasonably rely on the evidentiary foundation set forth in *Renton* and *[Young v.] American Mini Theatres* to the effect that secondary effects are

caused by the presence of even one adult entertainment establishment in a given neighborhood" and, of course, could rely on its own findings).

In *Alameda Books,* adult businesses brought a § 1983 action challenging a city ordinance prohibiting operation of multiple adult businesses in a single building. Based on its 1977 study concluding that concentrations of adult entertainment establishments are associated with higher crime rates in surrounding communities, Los Angeles enacted an ordinance in 1978 prohibiting such enterprises within 1,000 feet of each other or within 500 feet of a religious institution, school, or public park.[7] The ordinance's method of calculating distances created a loophole permitting the concentration of multiple adult enterprises in a single structure and so the city later (in 1983) amended the ordinance to prohibit more than one adult entertainment business in the same building. The district court granted summary judgment for the businesses and the Ninth Circuit affirmed. The U.S. Supreme Court granted certiorari.

The Ninth Circuit found that even if the ordinance was content neutral, the city had failed to demonstrate that its prohibition on multiple-use adult establishments was designed to serve its substantial interest in reducing crime. The circuit noted that the primary evidence relied upon by the city to demonstrate a link between combination adult businesses and harmful secondary effects was the 1977 study conducted by the city's planning department. The circuit found the city could not rely on that study because it did not support a reason-

6. Elsewhere in his opinion, Justice Kennedy stated "[i]t is well documented that multiple adult businesses in close proximity may change the character of a neighborhood for the worse." *Id.,* 122 S.Ct. at 1740.

7. The constitutionality of the original 1978 ordinance was not at issue in *Alameda Books.* Justice Kennedy in his concurring opinion and Justice Souter in his dissent merely assumed the original ordinance was constitutional. 122 S.Ct. at 1743 and 1744.

able belief that the combination of businesses produced harmful secondary effects of the type asserted.

The Supreme Court, in its plurality opinion, disagreed with the Ninth Circuit:

The Court of Appeals misunderstood the implications of the 1977 study. While the study reveals that areas with high concentrations of adult establishments are associated with high crime rates, areas with high concentrations of adult establishments are also areas with high concentrations of adult operations, albeit each in separate establishments. It was therefore consistent with the findings of the 1977 study, and thus reasonable for Los Angeles to suppose that a concentration of adult establishments is correlated with high crime rates because a concentration of operations in one location draws, for example, a greater concentration of adult consumers to the neighborhood, and a high density of such consumers either attracts or generates criminal activity. The assumption behind this theory is that having a number of adult operations in one single adult establishment draws the same dense foot traffic as having a number of distinct adult establishments in close proximity, such as minimalls and department stores similarly attract the crowds of consumers. [Citation omitted]. Under this view, it is rational for the city to infer that reducing the concentration of adult operations in a neighborhood, whether within separate establishments or in one large establishment, will reduce crime rates.

122 S.Ct. at 1735.

Plaintiff World Wide Video emphasizes certain language from the plurality opinion in *Alameda Books:*

In *Renton,* we specifically refused to set such a high bar for municipalities that want to address merely the secondary effects of protected speech. We held that a municipality may rely on any evidence that is "reasonably believed to be relevant" for demonstrating a connection between speech and a substantial, independent government interest.... **This is not to say that a municipality can get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rationale for its ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in *Renton.* If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance.** [Citation omitted].

*Id.* (Emphasis added).

World Wide Video asserts Spokane used "shoddy data or reasoning" in support of its Ordinances. Furthermore, World Wide Video contends it has casted doubt on Spokane's rationale for its Ordinances and has offered evidence disputing Spokane's factual findings. As such, World Video says the burden has shifted back to Spokane to supplement the record with evidence renewing support for its theory justifying the Ordinances. World Wide Video suggests Spokane can attempt to meet that burden at a trial on the merits.

Plaintiff has hired R. Bruce McLaughlin, a land use planner, who claims he has been "accepted as an expert witness in various federal and state courts, specifically with reference to the issues involved in this proceeding." He has been retained to conduct an original study of five adult

businesses currently operating in Spokane (including the three at issue in this case) to determine whether there is evidence establishing that these businesses have caused adverse secondary effects. He has also been retained to review and comment on the legislative history materials relied upon by the City of Spokane. He maintains that none of the studies relied upon by Spokane dealt specifically with the secondary effects associated with retail only business[8]; that none of these studies were conducted according to established planning principles and methodologies; and that a large proportion of the studies simply rely on earlier studies that were not conducted according to established planning principles. He says none of the studies rely on empirical data meaning they make no effort whatsoever to compare neighborhoods containing adult entertainment businesses to comparable control areas to determine whether there is a measurable and statistically significant difference between the two. He therefore undertakes his own empirical study, comparing the neighborhoods in which the subject adult businesses are located versus other neighborhoods (the control areas) and concludes the crime is just as great or greater in the control areas and that property values in adult business neighborhoods are equal to or greater than those in the control areas.

To the extent the studies relied upon by the City of Spokane deal with adult businesses, not solely retail in nature, this court concludes the city could reasonably believe those studies are relevant to the city's regulation of adult retail-only businesses. In *Z.J. Gifts*, the Tenth Circuit upheld the City of Aurora's dispersal ordinance, finding the record fully supported the city's regulation of sexually oriented businesses providing both on- and off-site viewing of sexually explicit materials. Several of the studies relied upon by the City of Aurora examined the effects of adult businesses or sexually oriented businesses generally and at least three of those studies examined the effects of adult bookstores on surrounding communities. 136 F.3d at 687. Many of the studies relied upon by the City of Aurora are relied upon by the City of Spokane, including the Garden Grove, California land use study reviewing impact of adult businesses (SPO 000427 attached to Declaration of Tim Szambelan); the Austin, Texas land use study reviewing crime rates, property values and trade area characteristics for areas surrounding adult bookstore, theater and topless bar (SPO 000550 attached to Declaration of Tim Szambelan); the Indianapolis, Indiana study examining the effects of sexually oriented business on crime rates and property values in surrounding areas and concluding that even relatively passive uses such as adult bookstores had a serious negative effect on their immediate environs (SPO 000202 attached to Declaration of Tim Szambelan); and the Amarillo, Texas study of adult businesses, including "bookstores ... with publications featuring nudity and explicit sexual activities," concluding such businesses lead to increase in street crime (SPO 000254 attached to Declaration of Tim Szambelan). *Id.* at 687, n. 1.

The Tenth Circuit in *Z.J. Gifts* found the distinction between on-site and off-site consumption of adult material "constitutionally irrelevant in determining whether Aurora's interests [were] important or substantial, particularly in light of the [Supreme] Court's strong statements regard-

---

**8.** Plaintiff's E. 1811 Sprague location is not a retail only business and plaintiff seemingly concedes this location is properly subject to Spokane's Ordinances as long as it continues to offer n-site viewing of adult materials.

ing the government's interest in regulating such businesses in *Young* and *Renton.*" *Id.* at 688. The City of Aurora had a substantial governmental interest and furthermore, it did not have to wait for sexually oriented businesses to locate within its boundaries, depress property values, increase crime, and spread sexually transmitted diseases before it regulated those businesses. It could rely on the experience of other cities to determine whether the harms presented by sexually oriented businesses were real and should be regulated. *Id.*

In *ILQ Investments, Inc. v. City of Rochester*, 25 F.3d 1413 (8th Cir.1994), the district court concluded the city was unreasonable in relying on other cities' studies because they did not specifically address businesses similar to Downtown Book and Video, that being an adult bookstore offering both "sexually explicit and non-sexually explicit materials" and allowing only off-premises consumption of those materials. The Eighth Circuit reversed. The studies the city council found relevant to Rochester's problems identified and measured adverse secondary effects linked to adult businesses generally, as well as to adverse secondary effects specifically attributable to adult bookstores. The court singled out the Indianapolis Study referred to above, as well as the St. Paul Study as examples of studies documenting the adverse secondary effects of adult bookstores in particular. 25 F.3d at 1417–18. The St. Paul Study is relied upon by the City of Spokane in the case at bar (SPO 000807 to Declaration of Tim Szambelan).

The Eighth Circuit held Rochester did not need to prove Downtown Book and Video would likely have the same adverse effects on its surroundings as the adult businesses studied in Indianapolis and St. Paul. *Id.* at 1418. So long as Rochester's

ordinance affected "only categories of businesses reasonably believed to produce some of the unwanted secondary effects," it was entitled a "reasonable opportunity to experiment with solutions to admittedly serious problems." *Id.*, quoting *Young*, 427 U.S. at 71, 96 S.Ct. 2440. Rochester relied upon studies that identified specific adverse secondary effects attributable to adult bookstores and it reasonably believed that evidence was relevant to the problems addressed by its ordinance. Even if Downtown Book and Video was a new type of adult business, it could not avoid time, place, and manner regulation justified by studies of the secondary effects of "reasonably similar businesses." *Id.*

This court does not find anything in the plurality opinion in *Alameda Books* to suggest the Tenth Circuit and the Eighth Circuit erred in finding that a municipality can reasonably rely on studies utilizing somewhat dissimilar businesses. As noted, in *Alameda Books*, the Supreme Court found the City of Los Angeles could reasonably rely on its 1977 study regarding concentration of adult entertainment establishments to draw inferences about secondary effects arising from concentration of adult operations within a single establishment. If anything, the Supreme Court's decision in *Alameda Books* is consistent with the Tenth Circuit's decision in *Z.J. Gifts* and the Eighth Circuit's decision in *ILQ Investments*.

■ A municipality need not have empirical data to support a time, place and manner regulation directed at secondary effects. In *Alameda Books*, the plurality opinion had this to say:

> Justice SOUTER faults the city for relying on the 1977 study not because the study fails to support the city's theory that adult department stores, like adult mini-malls, attract customers and thus

crime, but because the city does not demonstrate that free-standing single-use adult establishments reduce crime.... In effect, Justice SOUTER asks the city to demonstrate, not merely by appeal to common sense, but also with empirical data, that its ordinance will successfully lower crime. Our cases have never required that municipalities make such a showing, certainly not without actual and convincing evidence from plaintiffs to the contrary.... Such a requirement would go too far in undermining our settled position that municipalities must be given a "reasonable opportunity to experiment with solutions" to address the secondary effects of protected speech.

122 S.Ct. at 1736 (Emphasis added).

In *Erie v. Pap's A.M.*, the Supreme Court's majority opinion included the following passage:

JUSTICE SOUTER next hypothesizes that the reason we cannot accept Erie's conclusion is that, since the question whether these secondary effects occur is "amenable to empirical' treatment," we should ignore Erie's actual experience and instead require such empirical analysis ... (referring to a "scientifically sound' study offered by an *amicus curiae* to show that nude dancing establishments do not cause secondary effects.). In *Nixon [v. Shrink Missouri Government PAC]*, however, we flatly rejected that idea. 528 U.S. [377], at 394 [, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000)] (noting that the 'invocation of academic studies said to indicate' that the threatened harms are not real is insufficient to cast doubt on the experience of local government)"

529 U.S. at 300, 120 S.Ct. 1382.

In *DiMa Corp. v. Town of Hallie*, 185 F.3d 823 (7th Cir.1999), cert. denied, 529 U.S. 1067, 120 S.Ct. 1673, 146 L.Ed.2d 482 (2000), an operator of an adult bookstore brought a § 1983 action seeking declaratory and injunctive relief as to an ordinance restricting the hours of operation of adult establishments. The Seventh Circuit affirmed the district court's granting of summary judgment to the municipality and upheld the ordinance. In doing so, it noted that the plaintiff had submitted expert testimony and a study done in Phoenix to show there is no relation between an adult-oriented business' hours of operation and crime. Plaintiff had also proffered evidence showing there was in fact no correlation between Pure Pleasure being open 24 hours a day and crime in Hallie. According to the Seventh Circuit:

The district court properly rejected this evidence because it merely contradicts other evidence that the Hallie Board could have reasonably relied upon. It is therefore irrelevant to the question of whether there is some evidence that does support the Board's conclusions. DiMa's contradictory evidence would be highly probative if our task were to discover the objective truth about the effect of Pure Pleasure's operating in Hallie. But our task under the First Amendment is far different. The Hallie Board has the job of sorting through the available evidence and making a political judgment about what regulations best serve Hallie's interest. We are not here to judge how well the Board did its job; our task is to determine whether the law it enacted violates the Constitution. It does not.

*Id.* at 831.

More recently in *Baby Dolls Topless Saloons, Inc. v. City of Dallas*, 114 F.Supp.2d 531 (N.D.Tex.2000), a case in which Mr. McLaughlin testified, the district court concluded the city had justified its ordinance regulating adult entertainment businesses because:

While Intervenors presented testimony and evidence attempting to negate the empirical validity of the City's fact-finding, *see, e.g.,* McLaughlin testimony, the Court's concern "is not an empirical inquiry into the actual intent of the enacting legislature, but rather the existence or not of a current governmental interest in the service of which the challenged application of the statute may be constitutional."

*Id.* at 547, quoting *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 582, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (Souter, J., concurring). The district court's decision in *Baby Dolls* was recently affirmed by the Fifth Circuit in a decision dated June 20, 2002 at 295 F.3d 471 (5th Cir.2002), which post-dates the Supreme Court's May 13, 2002 decision in *Alameda Books.* On appeal, the plaintiff in *Baby Dolls* maintained that the evidence relied upon by the city was irrelevant to its ordinance and that the city needed specific evidence linking bikini tops to reducing secondary effects. The Fifth Circuit rejected that argument, quoting *Alameda Books* that a city is not required "to demonstrate[,] ... with empirical data, that its ordinance will successfully lower crime," at least "not without actual and convincing evidence from plaintiffs to the contrary," because "[s]uch a requirement would go to far in undermining [the] settled position that municipalities must be given a reasonable opportunity to experiment with solutions to address the secondary effects of protected speech." 295 F.3d at 481. The Fifth Circuit held the city needed only to produce some evidence of adverse secondary effects produced by adult entertainment in order to justify an enactment using the secondary effects doctrine. In addition, the city needed to pres-

ent sufficient evidence demonstrating a link between the regulation and the asserted governmental interest under *Renton's* "reasonable belief standard." *Id.*

■ "Common experience" can support a time, place and manner regulation, *Alameda Books,* 122 S.Ct. at 1743 (Justice Kennedy concurring in the judgment). Furthermore, this court has found no federal case which bars reliance on anecdotal evidence. In *Stringfellow's of New York, Ltd. v. City of New York,* 91 N.Y.2d 382, 671 N.Y.S.2d 406, 694 N.E.2d 407 (1998)[9], the New York Court of Appeals affirmed the decision of a lower court upholding New York City's adult zoning ordinance. In doing so, it stated:

> Contrary to plaintiffs' contentions, the "non-empirical," anecdotal evidence that comprised the bulk of the local studies does not render those studies worthless. In the proper context, anecdotal evidence and reported experience can be as telling as statistical data and can serve as a legitimate basis for finding negative secondary effects [citing *Renton,* 475 U.S. at 44, 106 S.Ct. 925 and *ILQ Investments,* 25 F.3d at 1416–17], particularly where, as here, the nonempirical information is extensive and indicative of a clear relationship between adult uses and urban decay.

694 N.E.2d at 417.

■ McLaughlin's empirical study focuses on blight, crime, and property values (Vol. 1 at pp. 100–115), but that does not tell the entire story about adverse secondary effects of adult establishments. Spokane only needs "some" evidence to support its Ordinances and this need not be empirical evidence. Spokane's legislative record (excerpts attached to Declaration of

---

9. *Stringfellow's* is part of Spokane's legislative record (SPO 000877 attached to Declaration of Tim Szambelan).

Tim Szambelan) is filled with complaints from neighbors of adult establishments concerning pornographic litter and used condoms in their neighborhoods and sexual acts occurring on or near the adult establishments. See Renton Declaration (SPO 000958), Lindell Declaration (SPO 000964), Walker Declaration (SPO 000980–001003), Citizen Complaints (SPO 001060–001087), Spokane City Council Meeting (SPO 001433), Plan Commission Minutes (SPO 001474), Plan Commission Minutes (SPO 001511), and City Council Transcript (001561). Indeed, even McLaughlin cannot so easily dismiss the problem of pornographic litter. (See Section 4.1 of Volume III "Supplement" and McLaughlin's deposition at pp. 25, 29, 30, 55, 57–58 attached as Ex. A to Second Declaration of Stephen A. Smith). The elimination of pornographic litter, by itself, represents a substantial governmental interest, especially as concerns protection of minors.[10]

Spokane's Ordinances "affect[ ] only categories of businesses reasonably believed to produce at least some of the unwanted secondary effects." Spokane has relied on evidence reasonably believed to be relevant for demonstrating a connection between speech and at least one substantial government interest. Spokane's evidence "fairly" supports the rationale for its ordinance. World Wide Video has not casted direct doubt on Spokane's rationale. Accordingly, Spokane's Ordinances are supported by a substantial governmental interest.

Furthermore, Spokane's Ordinances are "narrowly tailored" to serve that substantial governmental interest. Time, place or manner regulations on protected speech must be narrowly tailored, but "need not be the least restrictive or least intrusive means of doing so." *Z.J. Gifts*, 136 F.3d at 689, quoting *Rock Against Racism*, 491 U.S. at 798, 109 S.Ct. 2746. Instead, "[s]o long as the means chosen are not substantially broader than necessary," an ordinance is narrowly tailored if the regulation "promotes a substantial governmental interest that would be achieved less effectively absent the regulation." *Id.*, quoting *Rock Against Racism*, 491 U.S. at 799–800, 109 S.Ct. 2746.

In *Z.J. Gifts*, the Tenth Circuit found that "[u]nlike other zoning provisions held unconstitutional, Aurora's ordinance [did] not attempt to regulate businesses which have a minimal or nonexistent connection to sexually oriented entertainment." *Id.* at 689–90, citing among other cases, *World Wide Video v. Tukwila*, 117 Wash.2d 382, 816 P.2d 18 (1991) (invalidating ordinance regulating sexually oriented businesses defined to include businesses with ten percent or more of their stock in trade consisting of sexually oriented merchandise). Furthermore, the City of Aurora did not seek to justify its actions with a completely barren legislative record. Instead, Z.J. Gifts' business, Christie's, and businesses like it, were indisputably sexually oriented businesses—specifically "adult bookstores" as defined by the ordinance. The legislative record fully supported the city's concern regarding negative secondary effects caused by sexually oriented businesses, such as decreased property values and increased crime which were the problems the city sought to regulate by enacting the ordinance. *Id.* at 690.

The ordinance at issue in *Z.J. Gifts* is very similar to Spokane's Ordinance No. 32778.[11] This court finds that Spokane's

---

10. The court notes that McLaughlin's analysis was not presented to the Spokane City Council.

11. Aurora Mun.Code § 32.5–2 defined adult bookstore to mean "a commercial establishment which devotes a significant or substantial portion of its stock-in-trade ... to the

Ordinance No. 32778 does not attempt to regulate businesses which have a minimal or nonexistent connection to sexually oriented entertainment. Instead, it is directed at indisputably sexually oriented businesses, such as those owned by World Wide Video. As discussed above, Spokane's legislative record supports its concern regarding negative secondary effects caused by such businesses. Spokane's Ordinance No. 32778 is "narrowly tailored" to serve a substantial governmental interest.

### 3. Are There Ample Alternative Channels of Communication?

■ Dispersal ordinances aimed at controlling the secondary effects of adult establishments are constitutional if they are designed to serve a substantial governmental interest and allow for reasonable alternative avenues of communication. A claim that there are not reasonable alternative avenues of communication can be addressed only by analyzing the effect of the ordinance under the actual conditions prevailing in the city. *Isbell v. City of San Diego*, 258 F.3d 1108, 1112 (9th Cir.2001), citing *Renton*, 475 U.S. at 50, 53, 106 S.Ct. 925. The burden of persuasion is on the municipality to demonstrate that its ordinance provides reasonable alternative avenues of communication. *Id.*, citing *Lim v. City of Long Beach*, 217 F.3d 1050, 1054 (9th Cir.2000).

■ It must first be determined how many alternative sites are available. *Id.*, citing *Walnut Properties, Inc. v. City of Whittier*, 861 F.2d 1102, 1108 (9th Cir.

1988). Then it must be determined whether the number is sufficient to afford adult establishments a reasonable opportunity to relocate. *Id.*, citing *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1532–33 (9th Cir.1993). For sites to be available, they must be in the "actual business real estate market." Relevant considerations in determining whether a site is reasonably within the business real estate market are: (1) a relocation site is not part of the market if it is unreasonable to believe that it would ever become available to any commercial enterprise; (2) a relocation site in a manufacturing or industrial zone that is reasonably accessible to the general public may also be part of the market; (3) a site in a manufacturing zone that has proper infrastructure may be included in the market; (4) a site must be reasonable for some generic commercial enterprise, although not every particular enterprise, before it can be considered part of the market; and (5) a site that is commercially zoned is part of the relevant market. Furthermore, a site must satisfy the conditions of the zoning ordinance in question. *Id.* at 1112–13 and n. 1, citing *Lim*, 217 F.3d at 1055.

■ In determining the number of sites available for adult businesses, it is necessary to take into account any requirement of separation between adult establishments. The number of sites available to all adult businesses simultaneously must be considered when the separation requirement is taken into account. *Id.* at 1113–14, citing *Walnut Properties*, 861

---

sale, rental, or viewing ... of books, magazines, periodicals, ... films, motion pictures, video cassettes, ... or other visual representations ... of 'specified sexual activities' or 'specified anatomical areas.'" 136 F.3d at 690.

Spokane's ordinance defines "Adult Retail Use" as:

[A] retail establishment which, for money or any other form of consideration, either: (a) has as one of its principal purposes to sell, exchange, rent, loan, trade, transfer, or provide for viewing adult oriented merchandise; or (b) provides, as its substantial stock in trade, for the sale, exchange, rental, loan, trade, transfer, or viewing of adult oriented merchandise.

F.2d at 1108. Even if the number of available sites exceeds demand, that does not mean an ordinance is automatically constitutional because such a conclusion "is insufficient to account for the chilling effect that an adult use zoning ordinance may have on prospective business owners." *Id.* at 1114, quoting *Young v. City of Simi Valley,* 216 F.3d 807, 822 (9th Cir.2000). It is necessary for a court to look at other factors including the percentage of acreage theoretically available to adult businesses, the number of sites potentially available in relation to population, community needs, the incidence of adult businesses in comparable communities, and the goals of the city plan. *Id.,* citing *Young.*

Where the city has provided "a good faith and reasonable list of potentially available properties," it then becomes the plaintiff's burden to show that "certain sites would not reasonably become available." *Lim,* 217 F.3d at 1055.

 Spokane says it has provided World Wide Video with "a good faith and reasonable list of potentially available properties" as evidenced by the analysis the city had performed by appraiser Bruce Jolicoeur. Jolicoeur's declaration summarizes his opinions: 1) there are 475 parcels in the B–2, M1 and CBD zones where adult businesses are allowed to locate under the Spokane Ordinances;[12] 2) due to some consolidation of tax parcels, the 475 parcels form 326 identifiable properties; 3) of the 326 properties, 161 have the best commercial characteristics for the location of commercial uses, which could include adult businesses; 4) of the 161 properties, approximately 63 are actively listed for sale or lease; 5) applying the 750 feet separation requirement, at least 32 adult

businesses could locate in properties that meet the criteria in the ordinances for adult businesses which is enough to accommodate the six adult businesses in Spokane which have not already relocated (including the three at issue in the case at bar) and to accommodate any prospective adult businesses.

Plaintiff has retained Rich Crisler, a licensed real estate broker in Spokane, to "locate commercial property in Spokane that is correctly zoned for adult retail and is available for occupancy by adult businesses such as World Wide Video." Crisler conducted a survey in which he attempted to contact all property owners within the areas zoned for adult retail, "except those owners of residential parcels which were obviously too small to meet parking requirements."[13] Crisler concludes that:

> Throughout the area that is currently zoned for adult retail, there is one property that is immediately available for occupancy by a retail business. The remaining properties that are currently available for sale or lease consist of large tracts of undeveloped land or former industrial buildings that would require major remodeling and possible environmental cleanup prior to occupancy by retail. Assuming that these properties can be purchased or leased by someone intending to occupy them, they are unavailable for occupancy for an indefinite period of time.

(Crisler Declaration at Paragraph 8).

Plaintiff contends that considering the present termination date of November 2002, the net effect of Spokane's Ordinances will be to force all but one of the

---

**12.** Ordinance 33001 specifically made more sites available in the M–1 zone.

**13.** Spokane Municipal Code § 11.19.656(F)(1) requires one off-street parking space for every two hundred fifty feet of ground floor area.

existing adult retail businesses in Spokane to close (presumably Bobo's which has already relocated in compliance with the ordinance), with no definite prospect of reopening. Therefore, plaintiff says Spokane fails to satisfy its burden of demonstrating a minimal impact on expression.

Defendant notes that plaintiff retained a land use planner named Gareth Roe. At his deposition, Roe testified that based on his analysis of the impact of Spokane's dispersal ordinance, there were "60 possible simultaneous sites available for location of adult businesses." (Roe Depo. at p. 22, Ex. C to Second Declaration of Stephen A. Smith). Asked to assume there were six adult businesses which needed to be relocated, Roe agreed there were a sufficient number of sites for the relocation of these businesses. (*Id.* at pp. 45–46). Plaintiff has not submitted anything from Roe in opposition to defendant's motion for summary judgment.

Spokane, as part of its reply, has submitted a second declaration from Jolicoeur. Jolicoeur asserts Crisler failed to examine or discuss 92 parcels which "meet the necessary characteristics for location of an adult business under the ordinance that I have determined are the best available in the allowable area for location of a commercial business." Jolicoeur says his assessment jibes with what Roe stated in his report. According to Jolicoeur, on these 92 parcels it is possible to locate 18 simultaneous adult uses. Furthermore, says Jolicoeur, using only the data contained in Crisler's report, "of the 25–26 properties he identified as available, it is possible to locate 14 simultaneous adult businesses." The court fails to see where Crisler has offered any opinion about how many simultaneous adult businesses could be relocated on the properties he identified as available.

In his declaration at Paragraph 6, Crisler states:

In determining which properties were unavailable, I ruled out those properties which were occupied and subject to existing leases, properties which were owner occupied and the owner had no interest in selling or leasing to anyone, properties which were subject to restrictive covenants against sale or lease to an adult entertainment use, properties where only portions thereof are correctly zoned for adult entertainment, properties developed for a particular use such as office space, residential, or industrial, and the owner will not lease to an incompatible use such as retail, and properties with inadequate parking.

Crisler excludes properties which were occupied and subject to existing leases, but he does not take the length of the lease into account. In *Isbell,* the Ninth Circuit faulted the plaintiff for that same omission, stating that "[a]lthough a long term lease may exclude a site from the commercial market ... Isbell did not take the length of leases into consideration, thereby disregarding the fact that those sites could be potentially available." 258 F.3d at 1113.

The Ninth Circuit also found irrelevant Isbell's argument that parcels occupied by businesses such as car dealerships or plumbing supply outlets could not be part of the relevant business real estate market because they were not economically suited for his adult business. Quoting *Topanga Press,* the circuit noted "it is not relevant whether a ... site will result in lost profits, higher overhead costs, or even prove to be commercially infeasible for an adult business" because "the issue is whether any site is part of an actual market for commercial enterprises generally." *Id.,* quoting *Topanga Press,* 989 F.2d at 1531. Contrary thereto, Crisler excludes "properties developed for a particular use such

as office space, residential, or industrial, and the owner will not lease to an incompatible use such as retail."

Crisler excludes "properties which were owner occupied and the owner had no interest in selling or leasing to anyone," but even plaintiff concedes in his response brief (p. 19) that certain economic factors are irrelevant under the First Amendment "such as unwillingness of landlords to sell or lease to an adult use, the economic impracticality of relocating one's business to an industrial area where there are few commercial retail businesses, and the costs involved in purchasing and developing vacant land or in remodeling a building originally intended for industrial use."

Finally, Crisler excludes "properties which were subject to restrictive covenants against sale or lease to an adult entertainment use," but once again "the issue is whether any site is part of an actual market for commercial enterprises generally" and a site is not a genuine possibility for relocation only "when it is unreasonable to believe that it would ever become available to any commercial enterprise." *Topanga Press*, 989 F.2d at 1531. In *Lim v. City of Long Beach*, the plaintiff argued the district court erred in considering sites with restrictive leases banning adult entertainment establishments. The Ninth Circuit rejected that argument, noting that under *Topanga Press*, sites must only reasonably become available to some generic commercial enterprise, not specifically to adult businesses. 217 F.3d at 1055. In *Lim*, the sites with the restrictive leases were possibly available to commercial enterprises other than adult entertainment businesses and therefore, the district court had not erred in considering those sites part of the actual business real estate market. *Id.*

This court finds Spokane has provided a good faith and reasonable list of potentially available properties; that plaintiff has failed to show that in fact certain sites will not reasonably become available; and that the potentially available properties identified by Spokane are adequate to simultaneously accommodate all of the existing adult businesses in Spokane, plus a reasonable number of prospective adult businesses, so that there is minimal, if indeed any, impact on protected expression.

### 4. Summary

Spokane's dispersal Ordinances are content neutral time, place and manner regulations which are narrowly tailored to serve a substantial governmental interest and leave ample alternative channels for communication of protected speech. Spokane's Ordinances "reduce the costs of secondary effects without substantially reducing speech." *Alameda Books*, 122 S.Ct. at 1742 (Justice KENNEDY concurring in the judgment).

### C. First Amendment—Overbreadth

Plaintiff contends Spokane Ordinance No. 32778 is overbroad because "significant" or "substantial," as used in SMC 11.19.03023 ("a significant or substantial portion of its stock in trade [devoted] to the sale, exchange, rental, loan, transfer or viewing of 'adult-oriented merchandise' ") is nowhere defined. Plaintiff says that although its business clearly falls within this definition, it nonetheless has standing to challenge the ordinance for overbreadth and notes that it "may choose to reconfigure its business as a mainstream video store with a separate adult section" in the event the ordinance is upheld under the time, place, and manner analysis.[14] Ac-

---

14. In his declaration submitted in support of his previous motion for temporary restraining

order, however, WWV owner James R. Sicilia said he would not be able to convert his

cording to plaintiff, the ordinance is over-broad to the extent it applies to mixed use businesses which have less than a preponderance of sexually oriented material and which do not hold themselves out to the public as sexually oriented businesses.[15]

■ The overbreadth doctrine derives from the First Amendment and serves to invalidate legislation so sweeping that it reaches protected conduct, as well as unprotected conduct. *Broadrick v. Oklahoma*, 413 U.S. 601, 610, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). In *Broadrick*, the Supreme Court observed that in the First Amendment area, the traditional rules of standing have been altered to permit "attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity." *Id.* at 612, 93 S.Ct. 2908, quoting *Dombrowski v. Pfister*, 380 U.S. 479, 486, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). Litigants are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's existence may cause others not before the court to refrain from constitutionally protected speech or expression. These are referred to as claims of "facial overbreadth." *Id.*[16] Plaintiff therefore has standing to challenge Spokane's Ordinance No. 32778 on the basis of the overbreadth doctrine.

Plaintiff notes that in the *World Wide Video v. Tukwila* case, cited *supra*, the ordinance at issue there included in its definition of adult bookstore, retail store, or video store, any establishment in which ten percent or more of the stock-in-trade consisted of merchandise distinguished or characterized by an emphasis on specified sexual activities or specified anatomical areas, and/or any person was excluded by virtue of age from all or part of the premises generally held open to the public where such merchandise was displayed or sold. The Washington State Supreme Court found this definition would include mainstream video stores with restricted adult sections, even though the trial court had found that businesses with only ten and a half percent sexually explicit material did not cause the same type of adverse secondary effects as businesses which had one hundred percent sexually explicit material. Therefore, the Tukwila ordinance was not "narrowly tailored" to meet a substantial governmental interest. 117 Wash.2d at 389, 816 P.2d 18.

Plaintiff also cites *Wil–Kar, Inc. v. Village of Germantown*, 153 F.Supp.2d 982 (E.D.Wis.2001). That case involved Video Update, a mainstream video store which devoted about five percent of the square footage in its Germantown store to adult material. Two percent of its 30,000 videos were in the adult category. On the basis of the overbreadth doctrine, Video Update challenged the constitutionality of the Germantown ordinance requiring "adult-ori-

---

business to a non-adult video store because "[s]mall owner operated companies such as mine are not in a position to compete with the large chains such as Hollywood Video and Blockbuster."

**15.** Apparently, plaintiff is not pursuing the "vagueness" argument because as defendant points out, the Supreme Court has held that "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for

vagueness." *Parker v. Levy*, 417 U.S. 733, 756, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974).

**16.** See also *Wil–Kar, Inc. v. Village of Germantown*, 153 F.Supp.2d 982, 990 (E.D.Wis. 2001): "The doctrine permits litigants already before the court to challenge a regulation on its face [facial overbreadth] and raise the rights of third parties whose protected expression may be burdened by the regulation."

ented establishments" to obtain a license in order to operate.

The district court noted that before facial invalidation of a law is appropriate, the overbreadth must be substantial, and the law must not cover an easily identifiable range of constitutionally proscribable conduct. Furthermore, there must be no readily available limiting or narrowing construction capable of trimming the unconstitutional applications of the statute. *Id.* at 990–91, citing *Broadrick*, 413 U.S. at 613, 615, 93 S.Ct. 2908, and *Schultz v. City of Cumberland*, 228 F.3d 831, 848 (7th Cir. 2000). The court also noted that an enactment that purports to be aimed at secondary effects, but which also covers a substantial amount of expressive activity that cannot plausibly be believed to cause such effects, will be invalidated for overbreadth. *Id.* at 991, citing *Schultz*, 228 F.3d at 849.

The Germantown ordinance, on its face, covered all businesses that dealt in any sexually explicit material, regardless of how small a percentage of their inventory, floor space, or income was connected to such material. The municipality acknowledged the ordinance's definition encompassed materials sold by mainstream video outlets. It also conceded that it was unaware of any studies or other evidence finding secondary effects from establishments whose primary business is renting or selling mainstream videos to general audiences, but which also carry a small percentage of adult material. The record contained no such evidence. Accordingly, the court found the ordinance swept within its ambit sexually explicit expression unconnected to secondary effects and was therefore, overbroad. *Id.* at 993. The court also found the ordinance was substantially overbroad because it did not lend itself to easy identification of a range of constitutionally proscribable conduct and

was not susceptible of a narrowing construction. *Id.*

Spokane cites *Mom N Pops, Inc. v. City of Charlotte*, 979 F.Supp. 372 (W.D.N.C. 1997), where the court found the phrase "a significant or substantial portion of stock in trade" to not be overbroad. In *Mom N Pops*, the plaintiff there contended "substantial and significant" was overbroad because it was insufficiently determinate as to how much sexually explicit material qualified for the "adult" classification. The court found the plaintiff lacked standing to challenge the Charlotte ordinance on grounds of overbreadth and even if plaintiff did have standing, its overbreadth argument was unlikely to succeed because the ordinance did not create a "significant deterrent effect" that would justify invocation of the overbreadth doctrine. *Id.* at 394.

The *Mom N Pops* court relied on the Supreme Court's decision in *Young v. American Mini Theatres*. In *Young*, the Supreme Court noted that persons whose own speech is unprotected have standing to challenge the constitutionality of a statute purporting to prohibit protected or arguably protected speech if the statute's deterrent effect on legitimate expression is both real and substantial and if the statute is not readily subject to a narrowing construction by the state courts. 427 U.S. at 59–60, 96 S.Ct. 2440. The majority in *Young* agreed these concerns are not present when sexually explicit materials are at issue:

> Since there is surely a less vital interest in the uninhibited exhibition of material that is on the borderline between pornography and artistic expression than in the free dissemination of ideas of social and political significance, and since the limited amount of uncertainty in the ordinances is easily susceptible of a narrowing construction, we think this is an

inappropriate case in which to adjudicate the hypothetical claims of persons not before the Court.

*Id.* at 61, 96 S.Ct. 2440.

In sum, the court in *Mom N Pops* found the phrase "substantial or significant" did not create a "significant deterrent effect" on legitimate expression such as to warrant application of the overbreadth doctrine.

Spokane notes that the ordinance upheld in *Young* used the language "substantial or significant portion" in its definition of "adult bookstore." 427 U.S. at 53, n. 4, 96 S.Ct. 2440. The Supreme Court, however, did not specifically engage in an overbreadth analysis. Its analysis was limited to the question of vagueness.[17] In *Alameda Books*, the ordinance at issue likewise defined "adult bookstore" as an operation having "a substantial portion of its stock-in-trade and offers for sale" printed matter and videocassettes that emphasize the depiction of specified sexual activities. 122 S.Ct. at 1732. There again, however, the Supreme Court did not specifically engage in an overbreadth analysis of that particular portion of the ordinance.

■ Spokane's Ordinance No. 32778 is clearly distinguishable from the ordinances involved in *World Wide Video v. Tukwila* and *Wil–Kar, Inc. v. Village of Germantown.* Unlike *World Wide Video,* the definition of "adult retail use establishment" in the case at bar does not include a precise percentage (i.e., 10% or more) to delineate those businesses which would qualify as

"adult retail use establishment[s]."[18] And unlike *Wil–Kar, Inc.,* Spokane's definition of "adult retail use establishment" does not include any place that sells adult material, no matter how small the percentage.

■ This court has already found that Ordinance No. 32778 is "narrowly tailored" to serve a substantial governmental interest. It logically follows that the ordinance is not facially overbroad. This court finds that the term "significant or substantial portion" does not significantly deter legitimate forms of expression because it lends itself to "the easy identification of a range of constitutionally proscribable conduct." Furthermore, it is readily subject to a narrowing construction by state courts.[19]

### D. Constitutionality of Amortization Provision

Spokane contends that no amortization period is constitutionally required, citing *Baby Tam & Co. v. City of Las Vegas,* 247 F.3d 1003 (9th Cir.2001), *Ranch House, Inc. v. Amerson,* 238 F.3d 1273, 1286–88 (11th Cir.2001), and *Jake's Ltd., Inc. v. City of Coates,* 284 F.3d 884, 889 (8th Cir.2002).

In *Baby Tam,* the plaintiff contended that although amended city ordinances regulating adult bookstores were ultimately held constitutional, it was lawfully in business when the prior invalid ordinance came into effect and therefore, was entitled to continue its business under an ex-

---

**17.** The same appears to be true in *ILQ Investments,* 25 F.3d at 1418.

**18.** This court observes that the Washington Supreme Court in *World Wide Video* did not engage in the traditional overbreadth analysis specified by the U.S. Supreme Court.

**19.** "A well-understood and uniformly applied practice" may have the same effect on an

overbroad enactment as a narrowing judicial construction. *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 770 n. 11, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). There is no indication that Spokane has attempted to enforce its ordinance against any mainstream video stores since enactment of the same in March 2001.

ception for existing nonconforming uses. The Ninth Circuit disagreed:

> Baby Tam furnishes no authority for the proposition that a zoning ordinance may not prohibit a use in existence before its enactment, and we are aware of no such authority. To the contrary, it is established that city zoning may eliminate features of the landscape that pre-existed the zoning code and have been found objectionable under it.... In a variety of cases involving zoning that touched on the speech of those zoned it has not been a consideration that the use found objectionable under the zoning had predated the zoning. *E.g., Lim v. City of Long Beach,* 217 F.3d 1050, 1056 (9th Cir.2000); *Lydo Enterprises, Inc. v. City of Las Vegas,* 745 F.2d 1211 (9th Cir.1984).

247 F.3d at 1006.

In *Ranch House,* the plaintiff contended the First Amendment entitles existing businesses forced to relocate or change their operations in response to a new zoning law to the protections of a grandfathering or amortization clause. The Eleventh Circuit observed that it had never ruled on whether or when the First Amendment requires that a new zoning regulation contain a grandfathering or amortization clause for existing, non-conforming businesses. 238 F.3d at 1286. The circuit, however, did not go on to make such a ruling. Instead, it opted to remand the case to the district court so that the plaintiff could challenge the statute "as applied," and not on its face. *Id.* at 1287. According to the Eleventh circuit:

> We offer no opinion at this time on the merit of Ranch House's argument. Although as noted above some courts have required that zoning laws of the kind at issue here provide reasonable protection for existing businesses, the constitutional foundation for such a requirement is unclear, and has not been sufficiently addressed by the parties. The Takings Clause does provide some protection for businesses subject to new zoning laws. [Citations omitted].... And while the First Amendment may impose different and additional constraints on the ability of legislatures to curtail an existing business's protected expression through enactment of a zoning law, we are not aware of any case law discussing how those potential constraints might affect a statute that otherwise would survive time, place, and manner inquiry. Because these questions were neither fleshed out by the parties nor considered by the district court (let alone in the context of an as applied challenge), the wisest course is to direct the district court to address them on remand.

*Id.*

The Eleventh Circuit added that plaintiff's argument regarding the absence of an amortization period would be strengthened if it had the effect of completely denying public access to all protected nude entertainment in the county during the period necessary for plaintiff to relocate. *Id.,* citing *Young v. American Mini Theatres,* 427 U.S. at 71 n. 35, 96 S.Ct. 2440 (cautioning against the enactment of zoning regulations that have "the effect of suppressing or greatly restricting access to lawful speech"). Remand would also allow the district court to determine if enforcing the new zoning statute without an amortization period would immediately suppress substantially all such protected entertainment in the county and the effect, if any, of that fact. *Id.* at 1287–88.

On remand, however, the district court did not tackle the issue of whether an amortization period was constitutionally required. It simply held, following a bench trial, that amortization was an equitable issue for the court to determine and

concluded that seven months after the Eleventh Circuit made its final ruling would be an ample period allowing the plaintiff to relocate (assuming the circuit upheld the constitutionality of the zoning statute). *Ranch House, Inc. v. Amerson*, 146 F.Supp.2d 1180, 1213 (N.D.Ala.2001).

In *Jake's*, the plaintiff argued that a state statute permitting municipalities to use amortization as a means of eliminating nonconforming adult businesses was unconstitutional. The Eighth Circuit held that argument was without merit because it had repeatedly upheld amortization provisions requiring adult entertainment businesses to relocate as part of a municipality's valid time, place, and manner regulation of such businesses. The state statute merely authorized municipalities to amortize nonconforming sexually oriented businesses and therefore, the relevant question was whether a municipality's use of that authority complied with *Renton* standards. The ordinance as applied to the plaintiff passed muster under *Renton* and the state statute permitting amortization of "adults-only" businesses was valid under deferential rational basis review. 284 F.3d at 889.

While Spokane may read into these cases that no amortization period is necessary, it is clear that none of these cases confront head on the issue of whether an amortization period is constitutionally required in the event that a zoning ordinance otherwise meets the *Renton* time, place, and manner test. It is no wonder then that Spokane cites cases upholding flexible amortization periods allowing for extensions upon a showing of hardship (i.e., *Stringfellow's v. City of New York*, 91 N.Y.2d 382, 671 N.Y.S.2d 406, 694 N.E.2d 407, 420 (1998)).

Spokane's amortization provision (SMC 11.19.395) states that application may be made to the City Planning Director for an extension. He then makes his decision based on the following standard:

> The administrative decision on whether or not to approve any extension period and the length of such extension period shall be based upon the applicant clearly demonstrating extreme economic hardship based upon irreversible financial investment or commitment made prior to the date this provision becomes effective, which precludes reasonable alternative uses of the property.

This amortization provision does not vest unfettered discretion in the City of Spokane. It provides specific criteria for evaluating a hardship extension including that the applicant must show: (1) extreme economic hardship; (2) based upon a financial investment or commitment; (3) which was irreversible; (4) made prior to March 2001 (effective date of provision); and (5) which precludes reasonable alternative uses of the property. Furthermore, plaintiff World Wide Video has benefitted from the application of these criteria since it applied for and was granted a hardship extension, obtaining a six month extension from the Planning Director and then an additional two month extension following the administrative appeal to the Hearing Examiner.

To the extent an amortization provision is required by the First Amendment, this court finds that Spokane's provision adequately protects speech under the First Amendment. Moreover, Spokane's provision also satisfies Due Process (substantive and procedural) under the Fourteenth Amendment.

Plaintiff contends that the proper Due Process inquiry is whether the owner of a business deemed a non-conforming use has been afforded a reasonable period of time to terminate that use. Reasonableness is assessed by determining

whether the hardship to the user outweighs the benefit to the public to be gained from termination of the use. *Ebel v. City of Corona,* 767 F.2d 635, 639 (9th Cir.1985), citing *Northend Cinema v. Seattle,* 90 Wash.2d 709, 718–22, 585 P.2d 1153 (1978).[20]

Plaintiff argues that the termination period afforded to it is unreasonable considering its businesses "are subject to long term leases, that neither Plaintiff nor the landlord are likely to obtain replacement tenants willing to pay premium rates, that the properties to which Plaintiff could conceivably relocate are likely to require either construction from the ground up or extensive remodeling, and that the net effect of the ordinances at issue will be to force all but one of the existing businesses in Spokane to close." Plaintiff also says that for the purpose of determining whether the amortization period satisfies Due Process, the court should consider factors deemed irrelevant under the First Amendment time, place and manner analysis, including the unwillingness of landlords to sell or lease to an adult use, the economic impracticality of relocating a business to an industrial area where there are few commercial retail businesses, and the costs of purchasing and developing vacant land or in remodeling a building originally intended for industrial use.

Defendant contends Spokane's amortization provision survives scrutiny even if the *Northend Cinema* balancing test is used.[21] Defendant notes that in *Northend Cinema,* the Washington Supreme Court upheld a 90 day amortization period as reasonable because the business operators could move

their locations or could establish another type of business on their existing locations. Defendant asserts plaintiff here could do either, citing deposition testimony from plaintiff's owner, James R. Sicilia, that it would take six months to a year to move into a new business in the M–1 zone (Ex. E to Declaration of Stephen A. Smith at pp. 77–78), and also deposition testimony from Sicilia's landlord, Marco Barbanti, that it took plaintiff only two months to move into properties he rented to plaintiff and that previously he built a new structure for one of plaintiff's stores in about four months (Ex. F to Declaration of Stephen A. Smith at pp. 11–12 and 17–19). Defendant notes that Planning Director Mercer found that WWV's existing properties could be used for a variety of other retail or office uses because of their zoning classification (Community Business, B–2) and their location within an established commercial strip with a wide variety of businesses and along a major transportation corridor with substantial automobile traffic. (Exs. A–2, B–2 and C–2 to Declaration of John Mercer). Defendant also notes that Sicilia has not approached his landlord about the possibility of subleasing the existing properties, nor discussed with his landlord the fact that the existing leases forbid operating a business in violation of a city ordinance. (Ex. E. to Declaration of Stephen A. Smith at pp. 67–68 and 79–80).

Even employing the *Northend Cinema* balancing test, the court finds that the effective 20 month amortization period provided to plaintiff is reasonable as a matter of Due Process. Any hardship to

---

**20.** *Ebel* struck down a 60 day amortization period as too short, while *Northend Cinema* upheld a 90 day amortization period.

**21.** Defendant calls this the "fixed period analysis," distinguishing "flexible amortization" provisions which do not weigh the harm to

the city for extended use with the harm to the adult business owners. Instead, with flexible amortization provisions, the hardship evaluation is built into the request for a hardship extension.

plaintiff is outweighed by the benefit to the public from termination of the non-conforming use.

Plaintiff argues that the procedures for seeking an amortization extension under Spokane's Ordinance No. 32778 are inherently unfair because the Hearing Examiner (Greg Smith) was required to defer to the decision of the Planning Director (John Mercer) "who was involved in the legislative process leading to enactment of [the ordinance] and was one of the leading proponents of the legislation." Plaintiff contends this violates the appearance of fairness doctrine and Due Process and furthermore, that plaintiff was never given a full and fair hearing and a meaningful opportunity to be heard.

Plaintiff does not dispute that it was given an opportunity to submit all written evidence in support of its application for extension, plus the opportunity to make a written argument to the Planning Director John Mercer, the official charged with the responsibility for making an extension decision. Plaintiff obtained a six month extension from Mercer. Mercer says that although he did not believe plaintiff was entitled to an extension, he provided one anyway because of the impending passage of Ordinance No. 33001 which made new areas available for relocation (primarily in the M–1 Industrial Zone). (Mercer Declaration at Paragraph 8). Mercer's decision was then appealed by plaintiff to a Hearing Examiner who, in spite of his denial of the appeals, effectively gave plaintiff an additional two months to comply with the ordinance and relocate. Finally, as it was entitled to do, plaintiff appealed the Hearing Examiner's decision by way of a Land Use Petition filed in Spokane County Superior Court on June 4, 2002, which remains pending. In this petition, plaintiff raises the very First Amendment and Due Process challenges to the amortization pro-

vision which it raises in the case before this court. Plaintiff does not dispute that federal procedural due process rights are not triggered if adequate state remedies are available. *Lake Nacimiento Ranch Co. v. San Luis Obispo County*, 841 F.2d 872, 879 (9th Cir.1987).

The court fails to find any evidence of Fourteenth Amendment procedural due process violations or violations of the appearance of fairness doctrine.

### E. Washington State Constitution

Plaintiff contends Spokane's Ordinances violate the "stricter standards" of the Washington State Constitution, Article I, Section 5.

Article I, Section 5 provides that "[e]very person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." The Washington Supreme Court has held that under Article I, Section 5, certain time, place and manner restrictions on speech require the government to show a compelling state interest. *Ino Ino, Inc. v. Bellevue*, 132 Wash.2d 103, 117, 937 P.2d 154 (1997), cert. denied, 522 U.S. 1077, 118 S.Ct. 856, 139 L.Ed.2d 755 (1998), citing *Collier v. Tacoma*, 121 Wash.2d 737, 747, 854 P.2d 1046 (1993), and *Bering v. SHARE*, 106 Wash.2d 212, 234, 721 P.2d 918 (1986). Specifically, in *Collier* and *Bering*, the Supreme Court held that time, place and manner restrictions on pure, noncommercial speech in a traditional public forum require a showing of a compelling governmental interest. Of course, as noted above, federal courts have interpreted the First Amendment as requiring only a substantial governmental interest in support of time, place and manner restrictions. *Renton*, 475 U.S. at 50, 106 S.Ct. 925. In certain contexts, the Washington Supreme Court has followed the federal standard in evaluating time, place, and manner restric-

tions. *Ino Ino*, 132 Wash.2d at 116 and 118, 937 P.2d 154, citing *City of Seattle v. Huff*, 111 Wash.2d 923, 926, 767 P.2d 572 (1989) (no justification for extending greater protection under state constitution for speech in nonpublic fora); *National Fed'n of Retired Persons v. Insurance Comm'r*, 120 Wash.2d 101, 119, 838 P.2d 680 (1992) (federal analysis applied to challenges to regulations of commercial speech); and *State v. Reece*, 110 Wash.2d 766, 778, 757 P.2d 947 (1988)(state constitution does not provide greater protection in the context of obscenity).

At issue in the case at bar is pure, non-commercial speech. It is not "obscenity" under the prevailing law (i.e., child pornography which can completely and constitutionally be eradicated). Plaintiff's pure, non-commercial speech, however, is being practiced in non-public fora, not traditional public fora. In *Ino Ino*, the Washington Supreme Court found the sexually explicit dance at issue did not warrant the more protective time, place, and manner analysis of the state constitution, but that the text and history of Article I, Section 5 of the state constitution dictated "enhanced protection under the state constitution in the context of adult entertainment regulations that impose prior restraints." 132 Wash.2d at 122, 937 P.2d 154.[22] "Sexually explicit dance" involves conduct and not merely speech such as in case at bar. There is, however, no prior restraint issue in the case at bar.

Based on the foregoing, this court is inclined to believe the Washington Supreme Court would employ "intermediate scrutiny" (substantial governmental interest) instead of "strict scrutiny" (compelling governmental interest) in assessing the validity of Spokane's Ordinances under the Washington State Constitution. This court, however, need not make such a determination, nor need it determine whether the Ordinances would survive "strict scrutiny."

Plaintiff's Washington State Constitution claim does not fall within this court's original federal question jurisdiction (28 U.S.C. § 1331 and/or 28 U.S.C. § 1343(a)(3))[23], but instead falls within its supplemental jurisdiction under 28 U.S.C. § 1367(a) ("district courts have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution"). Because this court is dismissing all the claims over which it has original jurisdiction (the First Amendment and Fourteenth Amendment claims), it declines to exercise supplemental jurisdiction over the Washington State Constitution Claim. 28 U.S.C. § 1367(c)(3).

## IV. CONCLUSION

There are no genuine issues of material fact which preclude this court from finding as a matter of law that Spokane's Ordinances are valid under both the First and Fourteenth Amendments of the United States Constitution. Accordingly, defendant's Motion for Summary Judgment (Ct. Rec.23) is **GRANTED** and judgment on the plaintiff's First and Fourteenth Amendment claims is awarded in favor of defendant City of Spokane.

As such, defendant's Motion to Strike Declarations of R. Bruce McLaughlin and

---

**22.** The *Ino Ino* court also found no greater protection was indicated with regard to claims of overbreadth not rising to the level of prior restraint. 132 Wash.2d at 122, 937 P.2d 154.

**23.** Plaintiff does not plead diversity jurisdiction under 28 U.S.C. § 1332.

Rich Crisler (Ct.Rec.64) is **DISMISSED as moot** and plaintiff's Motion for Preliminary Injunction (Ct.Rec.56) is likewise **DISMISSED as moot.**

Plaintiff's Washington State Constitution Claim is **DISMISSED without prejudice** to being reasserted in state court.

**IT IS SO ORDERED.** The District Executive is directed to enter judgment accordingly and forward copies of the judgment and this order to counsel.